# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-02054-SCT

*CHAD BOOKER*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/03/2008 |
| TRIAL JUDGE: | HON. HENRY L. LACKEY |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | T. K. MOFFETT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/23/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Chad Booker was convicted of manslaughter in the Tippah County Circuit Court, Judge Henry L. Lackey presiding, and was sentenced to twenty years in the custody of the Mississippi Department of Corrections, with ten years suspended and five years of post-release supervision. Booker appealed, and we assigned this case to the Court of Appeals. After the Court of Appeals affirmed the trial-court judgment, we granted Booker's petition for writ of certiorari. Finding that no reversible error occurred at trial, we affirm the judgment of the Court of Appeals affirming the Tippah County Circuit Court judgment.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     The following history has been developed from the facts and trial-court proceedings as set forth in the Court of Appeals' opinion. ***Booker v. State***, 2010 WL 2491461, at **1-3 (¶¶ 2-11) (Miss. Ct. App. June 22, 2010).  We will add additional facts found in the record as needed for the sake of today's discussion.

¶3.     The events that set Booker's conviction into motion began as a dispute between neighbors who all lived near the intersection of County Roads 813 and 817 in the Palmer Community of Tippah County. That dispute culminated in the death of sixty-one-year-old David White. White and his adult son, Keith White (Keith), owned an all-terrain vehicle (ATV) shop that was located behind White's house. Booker's parents, Buster and Frieda Booker, lived across the street from White. Booker, who had his own home near his parents and White, was a twenty-three-year-old veteran of the United States Army at the time his dispute with White arose. As of March 2007, Booker operated an auto body shop and studied radiology at Blue Mountain College.

¶4.     On Saturday, March 10, 2007, White and Keith were working at their ATV shop. Booker drove a 1990s model Ford Mustang by the ATV shop. According to Keith, Booker drove the Mustang past the shop at approximately seventy-to-eighty miles per hour. Booker and his passenger, Tyler Medlin, disputed Keith's estimate of their speed. They testified that Booker was driving at a speed between forty and fifty miles per hour when they passed the Whites' ATV shop.  White was of the opinion that Booker had been driving too fast. When White and Keith heard the Mustang coming back, White went outside and flagged Booker down. According to both Booker and Medlin, White had come running outside and angrily

2

told Booker that he was driving too fast. When Booker said that he was test driving the Mustang because he could not get it to shift into third gear, White said, "Not on my d--- road!" Medlin and Booker both later testified that Booker had remained calm and told White that he should call the authorities if he had a problem. When White returned to his house, he did exactly that.

¶5. Unfortunately, that was not the end of the dispute. According to Keith, later that evening, Booker had stopped at the end of White's driveway, put his truck in neutral, and revved the engine. Keith testified that Booker had driven past White's house approximately four times that night, and on his last pass, he had yelled "f--- you." Shade White (Shade), Keith's son and White's grandson, also testified that he had heard Booker's truck stop in front of the house either four or five times and that he had heard Booker rev his engine.

¶6. White's wife, Charlotte, testified that Booker's parents each had called their house on Sunday afternoon at separate times regarding the confrontation between White and Booker. According to Charlotte, the call from Booker's parents had led to a discussion about whether White should apologize to Booker. White had not thought he needed to apologize to Booker. However, Charlotte testified that the last thing she had heard White say regarding the subject was, "I'm going to apologize."

¶7. It is undisputed that Booker beat White to death the next evening. Phillip "Possum" Nance gave statements to Terry Cox, an investigator employed by Booker's defense attorney, and Agent John Hillhouse of the Mississippi Bureau of Investigation (MBI). In both statements, Nance said that Booker had stopped by his used-car dealership on March 12. According to Nance, Booker had told him about his confrontation with White two days

3

earlier. Nance stated that Booker had been confused as to why White had called the police. Nance told Agent Hillhouse that Booker had been calm and that he had not said anything about retaliating against White. However, Nance also said that, according to Booker, during the confrontation the previous Saturday, Booker had told White that he (White) could call the authorities, or he (Booker) could get out of the Mustang so they could "settle it like men."

¶8.　　On Monday, March 12, 2007, Keith and White were returning home from picking up an ATV. Keith testified that, on their way home, they saw Booker at his shop, and they waved at him. Keith testified that Booker had waved back. Booker later corroborated Keith's testimony. According to Keith, after they had arrived at their shop, White decided to go apologize to Booker in an attempt to make peace. Keith testified that he had watched White drive his Yamaha Rhino ATV to Booker's house. Keith had gone back in the shop. Keith also testified that White had appeared calm when he had left. When White arrived at Booker's property, Booker was placing trash in the bed of a truck parked near the end of his driveway, which connects to the county road.

¶9.　　According to Booker, White had come "flying down [County Road] 813" to his property in a Rhino[1] "and kinda spun like he was going to do a U there" in Booker's driveway. Booker explained that White had parked in his driveway,[2] turned off the Rhino, got out of it quickly, and told Booker that he had to talk to him. Booker testified that he had told White to leave his property because he did not want to talk to him. Booker also testified

---

[1]A Rhino is an ATV with two bucket seats (enclosed with a roll bar), a center-mounted console shifter, and a steel dump bed.

[2]Photos of the crime scene differ from Booker's testimony as these photos depict the Rhino positioned between the truck (used to stow garbage) and the county road.

4

that White had said, "You're going to talk to me." According to Booker, White had attempted to grab Booker's collar with one hand and tried to punch him with the other hand. Booker testified that he had grabbed White's wrist, and while pulling White toward him, he had punched White in the face three times. Booker further testified that White had stumbled away and had sat back down in the Rhino.

¶10. Booker walked away from the scene of the altercation. According to Booker, White had been still standing when he had left. Booker later explained that he had walked down the road and called his cousin Wendell Booker (Wendell). Booker asked Wendell to come get him because he "had been in a bad situation." Shortly after Wendell had picked him up, Booker's mother called him. Booker returned to his shop, where he was taken into custody by officers with the Tippah County Sheriff's Department.

¶11. Brenda Morgan, a certified nurse who formerly had worked in the emergency room and intensive-care unit of the local hospital, happened to drive by the scene a short time later. Morgan knew White, but she did not recognize him. She stopped solely because she saw someone slumped over in an ATV. White was unconscious and slumped over the center console of the Rhino. The left side of White's face was extremely swollen, and he was bleeding from both ears and his nose. Blood was on the center console shift handle. White's glasses were in the county road, adjacent to the Rhino,[3] and his baseball cap was on the passenger-side floorboard of the Rhino. Morgan did not detect a pulse on White's wrist or his neck. Morgan called 911, and then she and Jeff Butler, who also had stopped as he drove by, got White out of the ATV and began to perform CPR. Another of White's neighbors,

---

[3]White's glasses were an estimated four feet from the Rhino and had been damaged.

5

Clinton Bryant, drove by and noticed that something appeared to be wrong with White. Bryant found Keith and told him that White appeared to need help. When Keith arrived at Booker's house, he found Morgan and Butler tending to his father. Despite the efforts of emergency responders, White was unable to recover from his injuries.

¶12. Booker was indicted for murder. He pleaded not guilty, and the case ultimately went to trial. At the conclusion of Booker's trial, the circuit court instructed the jury on murder and manslaughter; the jury found Booker guilty of manslaughter. *Booker*, 2010 WL 2491461, at **1-3 (¶¶ 2-11).

### PROCEEDINGS IN THE COURT OF APPEALS

¶13. Before the Court of Appeals, Booker raised the following six issues: (1) the circuit court erred in denying Booker's motions for a directed verdict, judgment notwithstanding the verdict, and a new trial; (2) the circuit court failed to properly instruct the jury; (3) the circuit court erred in allowing Morgan to give opinion testimony; (4) the circuit court erred in allowing Shade to testify; (5) the circuit court erred in refusing to admit evidence offered by Booker; and (6) the circuit court erred in allowing testimony concerning where White's cap was found. *Booker*, 2010 WL 2491461, at *3 (¶11).

### DISCUSSION

¶14. The majority for the Court of Appeals found no merit in Booker's arguments.[4] After the Court of Appeals denied Booker's motion for rehearing, Booker filed a petition for writ

---

[4]Judge Ishee wrote a dissenting opinion, joined by Chief Judge King, opining that Booker's conviction should have been reversed and the case remanded for a new trial due to erroneously refused jury instructions and erroneous rulings on evidentiary issues. Two judges did not participate.

of certiorari, asking us to consider several issues, including the issue of whether the trial court erred in failing to grant a directed verdict of acquittal under the *Weathersby* rule. *Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933). In granting certiorari, we have the authority to "limit the question on review."[5] Miss. R. App. P. 17(h). *Brown v. State*, 39 So. 3d 890, 895 (Miss. 2010) (citing *Brown v. State*, 986 So. 2d 270, 272 n.1 (Miss. 2008); *Dora v. State*, 986 So. 2d 917, 921 n.8 (Miss. 2008)).

¶15.   We specifically note our agreement with the Court of Appeals' finding that the *Weathersby* rule was inapplicable under the facts of this case. We write today to expand the

---

[5]For the sake of clarity, we acknowledge that Booker, through counsel, objected at trial to the State's Jury Instruction S-2A, but the objection to this instruction was to the inclusion of the term, "deadly force." Booker did not object by alleging that the instruction contained an incorrect statement of the law on the elements of manslaughter. In his appellate brief, Booker, through counsel, never argued that the instruction was an incorrect statement of the law, but only that there was insufficient evidence to support the granting of the manslaughter instruction. In his petition for writ of certiorari, Booker, for the first time, attacks the wording of Jury Instruction S-2A by asserting:

> T]he "heat of passion" manslaughter statute, Miss. Code Ann. §97-3-35, requires that the killing be done "in a cruel or unusual manner, or by the use of a dangerous weapon." No dangerous weapon was used. Although three quick punches to the head when one is being punched at himself should not be sufficient to constitute "a cruel or unusual manner" as contemplated by the statute, the trial court, at the very least, had a duty to instruct the jury as to the issue so that the jury could make that determination.

Since no contemporaneous objection was made at trial on the issue that the State's proffered manslaughter instruction contained an incorrect statement of the law, Booker is procedurally barred from making this assertion for the first time on appeal. *Birkhead v. State*, 57 So. 3d 1223, 1239 (Miss. 2011). Finally, we note that, once the trial court granted the State's proffered manslaughter instruction, Booker withdrew his proposed manslaughter instruction from consideration by the trial court. Thus, the trial court was never given the opportunity to rule on Booker's proposed manslaughter instruction.

7

Court of Appeals' discussion on this issue inasmuch as this Court is divided on the issue of whether the *Weathersby* rule applies in today's case based on the record before us. With regard to Booker's remaining issues, we find the Court of Appeals very ably discussed these issues, correctly applying the law to the facts as revealed in the record. Accordingly, we adopt the Court of Appeals' analyses on these remaining issues, and we find them to be without merit. *Booker*, 2010 WL 2491461, at **3-16 (¶¶ 15-63).

¶16.    We turn now to our discussion of the *Weathersby* rule, and we restate the issue for the sake of our discussion.

> **WHETHER THE TRIAL COURT ERRED BY REFUSING TO GRANT BOOKER'S MOTION FOR A DIRECTED VERDICT UNDER *WEATHERSBY*.**

¶17.    The *Weathersby* rule states,

> where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, *unless substantially contradicted* in material particulars by a credible witness or witnesses for the state, or *by the physical facts* or *by the facts of common knowledge*.

*Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933) (emphasis added).  This Court also has recognized that, if the defendant's testimony "satisfies all the elements of murder or manslaughter, the defendant would not be entitled to a directed verdict of acquittal, as [this] testimony would be the basis for a valid conviction[,]" and the *Weathersby* rule would not apply. *Johnson v. State*, 987 So. 2d 420, 425 (Miss. 2008).

¶18.    We find *Weathersby* inapplicable for two distinct reasons: (1) Booker's version of the incident satisfies the elements of manslaughter, and (2) Booker's version "is substantially contradicted in material particulars" (a) by credible witnesses, including the prosecution's

8

witnesses; (b) by the physical facts at the crime scene; and (c) by the facts of common knowledge. *Weathersby*, 147 So. at 482; *see Johnson*, 987 So. 2d at 424-25.

*1. Elements of Manslaughter*

¶19.     Mississippi Code Section 97-3-35 (Rev. 2006) "contemplates alternative theories to sustain a manslaughter conviction in that the crime may be charged as a killing in 'a cruel or unusual manner' *or* 'by use of a deadly weapon.'" *See Martin v. State*, 818 So. 2d 380, 382 (Miss. Ct. App. 2002) (citing Miss. Code Ann. § 97-3-35 (Rev. 2006)). "It is a general rule that where a statute denounces as an offense two or more distinctive acts, things, or transactions enumerated therein in the disjunctive, the whole may be charged conjunctively and the defendant found guilty of either one." *Martin*, 818 So. 2d at 382 (quoting *Lenoir v. State,* 237 Miss. 620, 623, 115 So. 2d 731, 732 (1959)). To find Booker guilty of the lesser-included offense of manslaughter, the jury could have found, among the other requisite elements, that Booker had killed White in a "cruel or unusual manner" or "by use of a deadly weapon." *Martin*, 818 So. 2d at 382; Miss. Code Ann. § 97-3-35.

¶20.     The Court of Appeals found that the learned trial judge correctly had determined that the *Weathersby* rule was not applicable to the facts of this case. *Booker v. State*, 2010 WL 2491461, at *3 (¶¶12-14). Specifically, the Court of Appeals reasoned that "Booker's version of the incident satisfie[d] the elements of manslaughter" under Mississippi Code Section 97-3-35 (Rev. 2006).[6] *Id.* at *3 (¶14). In other words, even if the jury believed that

---

[6]Mississippi Code Section 97-3-35 (Rev. 2006) defines manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ."

9

White had attacked Booker, the jury reasonably could have found, based on Booker's version of the incident, that Booker did not act in necessary self-defense and was guilty of manslaughter.

¶21. Although the Court of Appeals did not specifically articulate how Booker's version of the incident would have satisfied the elements of manslaughter at that point in the opinion, the Court of Appeals later stated:

> It is important to consider that, *even if the evidence was undisputed that White was the initial aggressor*, the jury could have still found Booker guilty of manslaughter. *See Cooper v. State,* 911 So. 2d 665, 671-72 (¶ 27) (Miss. Ct. App. 2005). The extent of force used by Booker in exerting his claim of necessary self-defense was front and center in this case. The jury was instructed that the degree of force used in necessary self-defense must be measured by the degree of the threat of harm that was apparent from the circumstances. A reasonable juror could have concluded that Booker could have readily subdued any threat White posed without beating White to death. As of March 12, 2007, Booker was a twenty-three-year-old man in prime physical condition who relatively recently had returned from active duty with the United States Army. Booker was 5'11 and weighed 170 pounds. However, Booker testified that he worked out "[p]retty much everyday," and at that time, he could bench press approximately 405 pounds while wearing a particular shirt designed to aid weightlifters. White was sixty-one years old and two inches shorter than Booker. Testimony indicated that White had high blood pressure, hardening of the arteries, and he was borderline diabetic. He was certainly not as physically conditioned as Booker. The prosecution repeatedly asked Booker if he was afraid of White and whether it was necessary to act as he did. Booker simply answered that he "just reacted" and that he did not know whether he could have subdued White in some way short of beating him to death.

*Booker*, 2010 WL 2491461, at *11 (¶42) (emphasis added). Based on Booker's testimony that he had struck White three times in the head, the jury could have concluded that Booker did not act in necessary self-defense and was guilty of manslaughter.

¶22.   This Court agrees. In *Cooper*, affirming a manslaughter conviction, the Court of Appeals found that the jury could have considered whether the defendant had used excessive force when striking the alleged aggressor for a second time with a baseball bat:

> A reasonable, hypothetical juror could conclude that Cooper, having landed the first blow to Kenneth's skull, acted unreasonably when he struck Kenneth in the head again. Not only did he strike him again, he struck him with an aluminum baseball bat. It is not outside the realm of possibility that a reasonable hypothetical juror could find that Cooper did not act in self-defense because Cooper, having landed a previous skull-crushing blow with a baseball bat, delivered a second skull-crushing blow. A reasonable hypothetical juror could conclude that Kenneth would have been incapacitated by a strike with force sufficient to shatter his skull, so that he could not have presented a reasonable threat sufficient to warrant a similar follow-up strike to Kenneth's head.
>
> While testimony indicated that Cooper acted in self-defense and defense of others, testimony also indicated that Cooper acted unreasonably . . . . Under the circumstances, we defer to the jurors as finders of fact, and the jury found that Cooper acted unreasonably under the circumstances when the jury found Cooper guilty of manslaughter.

*Cooper*, 911 So. 2d at 671-72. Under *Cooper*, when a defendant, upon being attacked, repeatedly strikes another with a deadly weapon, in the heat of passion but no longer in necessary self-defense, then this defendant can be guilty of manslaughter. *Cooper*, 911 So. 2d at 671-72.

¶23.   In *Cooper*, the defendant used a baseball bat as a deadly weapon. *Id.* Booker testified that he had retaliated with his fists. This Court has stated that whether a defendant's fists constitute a deadly weapon is a jury question. In *Pulliam v. State*, 298 So. 2d 711, 713 (Miss. 1974), a case decided under the former aggravated-assault statute (Section 2011,

11

Mississippi Code, 1942 Annotated (1956)),[7] this Court stated that "[w]hile the use of feet and fists ordinarily would not constitute the use of a deadly weapon, they can constitute a deadly weapon if used with means or force likely to produce death. Whether they are so used is for the jury to determine from the evidence."[8] *See Jackson v. State*, 594 So. 2d 20, 24 (Miss. 1992)); *see also King v. State*, 251 Miss. 161, 168 So. 2d 637 (1964) (affirming manslaughter conviction where defendant "stomped" the decedent to death); *Johnson v. State*, 230 So. 2d 810, 811 (Miss. 1970) (finding that whether a "shoe clad foot" was a deadly weapon, under the former aggravated-assault statute, was a jury determination "in the light of evidence as to how and in what manner it is employed.").

¶24.   Alternatively, the jury could have found that Booker had killed White in a cruel or unusual manner. The majority for the Court of Appeals pointed out:

> Booker admitted that he punched White in the head several times, which resulted in White's death. At best, the evidence indicates that Booker landed three punches to the left side of White's head while White was attempting to punch him. At worst, Booker punched White in the head while White remained seated in the Rhino. Either of these scenarios is sufficient to constitute "a cruel or unusual manner."

---

[7]Now Mississippi Code Section 97-3-7 (Rev. 2006).

[8]If the jury found that Booker's fists, used repeatedly under the circumstances, constituted a dangerous weapon, then malice would have been implied. When a deadly weapon is used, malice is implied. *Wilson v. State*, 574 So. 2d 1324, 1336 (Miss. 1991) (citing *Fairchild v. State*, 459 So. 2d 793, 802 (Miss. 1984)). However, no malice is present if the defendant was acting in the heat of passion. *Id.*  Here, according to Booker's version of the incident, White attacked Booker. Coupled with the facts that White and Booker had been at odds with each other in the days before the altercation, this alleged act of aggression was sufficient to support a finding that Booker repeatedly struck White in the heat of passion and not out of malice. *See Jones v. State*, 39 So. 3d 860, 866 (Miss. 2010) (citations omitted) (defining heat of passion as a "state of violent and uncontrollable rage engendered by a blow or certain other provocation given")).

***Booker***, 2010 WL 2491461, at *4 (¶17).

¶25. We find that Booker's striking White three times sufficiently presented a jury question as to whether Booker's actions were cruel or unusual. *See **Martin v. State***, 354 So. 2d 1114, 1117-18 (Miss. 1978) (permitting jury instruction for manslaughter based on cruel and unusual manner "where it was uncontroverted that the deceased [a child] was the victim of a brutal beating"). Booker admitted that he had grabbed White, a sixty-one-year-old man in less-than-good health, by the wrists, had pulled White towards him and had punched him. He struck him, not once but three times on the side of the head. Uncontradicted physical evidence showed that White died of blunt-force trauma to his head. Booker's punches separated blood vessels in White's brain from his skull, causing White's brain to bleed and swell, resulting in his death.

¶26. Even based on Booker's version of the incident, the jury reasonably could have found that Booker did not act in necessary self-defense and was guilty of manslaughter, thus making the ***Weathersby*** rule inapplicable.

*2. Evidence Substantially Contradicting Booker's Version of the Incident*

¶27. On the other hand, evidence in the record substantially contradicts Booker's claim of self-defense and supports the manslaughter conviction. *See **Johnson***, 987 So. 2d at 424 (stating that defendant's version "if reasonable, must be accepted as true, *unless substantially contradicted in material particulars* by . . . the physical facts . . . .") (citations omitted).

¶28. After Booker's counsel moved for a directed verdict at the close of the State's case-in-chief, the trial judge explained his reasons for denying Booker's motion under ***Weathersby***:

13

a prima facie case of murder has been made out, particularly in the Court's opinion, as to the nature and severity of the injuries from the photographs that were taken.

. . . .

The Weathersby rule is still alive and, of course, where the defendant and his witnesses are the only witnesses, it must be contradicted in material particulars by credible witness or witnesses, and the Court is of the opinion that the medical personnel that opined that it would be unlikely for Mr. White to have suffered the injuries like he has suffered and to have gotten back into that ATV would have been unlikely contradicts the defendant's version of what happened and the material particulars. For that reason, the Court is compelled to overrule the defendant's motion to dismiss.

¶29. This Court has recognized the narrow context in which **Weathersby** applies. In **Berry v. State**, 455 So. 2d 774, 776 (Miss. 1984), this Court stated "that it is a rare case which meets the requirements of **Weathersby**." **Weathersby** did not apply

> . . . in **Thornhill v. State**, 561 So. 2d 1025, 1030-32 (Miss. 1989), [*overruled on other grounds by **Bush v. State**, 895 So. 2d 836, 844 n.2 (Miss. 2005)*], where defendant's self-defense theory was eroded by the facts that (1) no glass was found under the victim but was only on top of him and to his side, *somewhat undermining the story* that the victim had broken the window in the door himself; (2) the hammer was not found gripped in the victim's hand and no prints were on it; (3) there was no glass on the victim's boots; and, (4) there were no cuts on the victim's hands or arms . . . .

**Heidel v. State**, 587 So. 2d 835, 839 (Miss. 1991) (emphasis added).

¶30. **Weathersby** does not require the State to offer evidence excluding the defendant's theory from the realm of possibility; rather, the State must offer evidence that substantially contradicts the material particulars of the defendant's version of the incident. **Weathersby**, 147 So. at 482. In making this decision, this Court must "determine whether there was credible evidence that contradicted [the defendant's] account of the [incident]." **Wilson v. State**, 956 So. 2d 1044, 1048 (Miss. Ct. App. 2007).

14

¶31.    In *Weathersby*, the State presented evidence that, if credible, would have created an issue for the jury to decide. *Weathersby*, 147 So. at 482. As articulated in *Weathersby*, the State's evidence did contradict the defendant's theory about where the defendant was alleged to have been standing during the incident:

> The only distinct contradiction of appellant's version of the killing was some evidence by the state that the shot went through some growing corn in such a manner as to have shown that the defendant could not have been at the point where he said he stood and the deceased at the point where appellant placed him. Other witnesses for the state corroborated in this particular the locations assisted by the appellant. As we see it, under this particular record, these differences are in detail and not in controlling substance. The appellant and his wife, particularly the latter, appeared to have been considerably frightened as the deceased, who had already been to the home of appellant a few moments previously, at which time he threatened both of them with death. . . . Thus, as would be expected, there . . . are some minor discrepancies in the testimony of the husband and wife, which rather strengthens their testimony than weakens it, because this evidences the absence of a previously prepared and agreed story on their part.

*Id.* The State's evidence did not substantially contradict the defendants' version of the incident, because this evidence did not contradict the defendants' version of events in a meaningful way – that is, this evidence pointed to only "minor discrepancies" in detail, easily explained by the defendants' obvious state of fear. *Id.* Accordingly, the Court in *Weathersby* did not find the State's evidence to "substantially contradic[t]" the defendants' version of the incident, and the defendants' version of the events had to be regarded as true. *Id.*

¶32.    Unlike in *Weathersby*, the State's evidence in the record before this Court today does not point simply to "differences . . . in detail" but to differences in "controlling substance" that are not consistent with Booker's version of the incident. *Id.* Specifically, evidence in the

15

record supports the State's theory that Booker attacked White while White was seated in the Rhino.

¶33. Pathologist Dr. Steven Hayne testified for the prosecution that, while White "possibly" could have received such a beating and then walked to the Rhino, that this was very unlikely:

> **[Defense]**: Is it possible for Mr. White to have received a blow or blows and received a concussion and still remained on his feet and gotten back into his vehicle?
>
> **[Dr. Hayne]**: I couldn't exclude that, Counselor, but *I think that would be very unlikely*. In these type of injuries, I would expect the person to suffer a concussion, which you cannot see medically; but statistically, *it's far more probable that the individual suffered a concussion which by definition a person loses consciousness . . .*
>
> . . . .
>
> **[Defense]**: So he could have received a concussion, been out on his feet, not gone down, regained consciousness, and gotten in his vehicle?
>
> **[Dr. Hayne]**: It would be possible, Counselor. I couldn't exclude that.
>
> **[Defense]**: You could not exclude that, could you?
>
> **[Dr. Hayne]**: *But I would not favor that at all.*

(Emphasis added.) Dr. Hayne testified that White possibly[9] could have received such blows and gotten back into the Rhino; however, based on the physical facts of this case, Dr. Hayne added that he "would not favor that *at all*." (Emphasis added.) This expert testimony provided that Booker's version of the events was "very unlikely." Accordingly, this expert testimony, admissible under our rules of evidence, substantially[10] contradicted[11] Booker's version of the incident and created a question for the jury to resolve.

¶34. Photographs of the crime scene received into evidence and the location of White's glasses also substantially contradicted Booker's version of the incident. White's glasses were found on the county road adjacent to the Rhino. Photos of the Rhino reveal that it had no windows, making it reasonable to conclude that if Booker had struck White's head on the left

---

[9]The dissent takes the position that Dr. Hayne *admitted*, not stated, on cross-examination that Booker's version of events was a "distinct possibility." The exchange between defense counsel and Dr. Hayne, however, was ambiguous:

> **[Defense Attorney]**: And do you believe in this particular case that Mr. White would have had a moment of unconsciousness?
> **[Dr. Hayne]**: Yes, sir.
> **[Defense Attorney]**: And then been conscious again?
> **[Dr. Hayne]**: That's a possibility, Counselor. *He could have remained unconscious. That is certainly a distinct possibility.*
> **[Defense Attorney]**: But it's also a distinct possibility he could have regained consciousness?
> **[Dr. Hayne]**: That's *possible*, Counselor, for a very short period of time.

(Emphasis added.) What is crystal clear is that Dr. Hayne maintained that the scenario put forth by Booker was very unlikely and not to be favored based on the facts of the case.

[10]Essentially; without material qualification; in the main; in substance; materially; in a substantial manner. *Blacks's Law Dictionary* 326 (6th ed. 1990).

[11]To disprove. To prove a fact contrary to what has been asserted by a witness. *Black's Law Dictionary* 1428-29 (6th ed. 1990).

17

side, that White's glasses would have been propelled out of the Rhino's right passenger side and onto the adjacent county road. While this Court recognizes that no crime scene is perfect and that medical intervention had been performed on White before a crime scene had been established, the location of the glasses, adjacent to the Rhino, was consistent with a finding that Booker had attacked White in the Rhino and, importantly, also was inconsistent with Booker's version of the incident.

¶35. Moreover, the jury reasonably could have found that the location of White's hat on the floor of the passenger side of the Rhino contradicted Booker's version of the incident. White's son testified that White typically wore a hat and was wearing one when he went to see Booker immediately before the fatal altercation.[12] Booker stated that he had struck White three times in the head after White had exited the Rhino. The location of the hat inside the Rhino directly contradicts Booker's version of the incident – namely that White ever had exited the Rhino to engage in the altercation. If White had been outside the Rhino when the altercation occurred, White's hat, more likely than not, would have been knocked off outside the Rhino. After receiving three blows to the head, common sense dictates that White would not have had the wherewithal to put the hat back on his head before, as Booker alleges, White sat back down in the Rhino.

¶36. Outside the jury's presence and upon objection to the State's eliciting testimony from White's son about the hat in the Rhino (based on an alleged discovery violation), Booker's defense attorney stated that this physical evidence contradicted Booker's version of events:

---

[12]Booker testified that he could not remember whether White had been wearing a hat at the time of the incident.

**[Defense Attorney]**: Yes, sir. The defense would object, your Honor, on the basis of the State trying to elicit testimony from this witness that his father's cap was found inside the Rhino for purposes of eliciting from this witness that the father always wore a cap to try to physically contradict the defendant's version of the events . . . .

**[Court]**: Tell me how that contradicts the defendant's version of how it occurred. That they found the hat in the Rhino?

**[Defense Attorney]**: If this witness is going to claim daddy always wore a cap and he never took the cap off . . . [t]hen the fact that the hat is outside or not outside of the Rhino would physically contradict the defendant's version of the events, therefore, being in my opinion, the most important piece of physical evidence the State of Mississippi could have . . . .

¶37. In sum, the degree and severity of the injuries inflicted upon White discount any inference that the altercation between Booker and White amounted to no more than "a garden-variety fist-fight." Also, the fact that the victim was found unconscious in his Rhino on Booker's property; the location of the victim's glasses; and the location of the victim's hat, considered, together, substantially contradict Booker's version of the incident.

## CONCLUSION

¶38. The learned trial judge correctly found the ***Weathersby*** rule to be inapplicable and properly permitted this case to go to the jury. Having considered the rest of Booker's arguments before the Court of Appeals and found them to be without merit, we adopt the Court of Appeals' reasoning. Accordingly, we affirm the Court of Appeals' judgment, which affirmed the trial court's judgment of conviction and sentence for the crime of manslaughter.

¶39. **CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN (10) YEARS SUSPENDED, TEN (10) YEARS TO SERVE AND FIVE (5) YEARS OF POST-RELEASE SUPERVISION, WITH CONDITIONS, AFFIRMED**.

19

**WALLER, C.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND CHANDLER, J. KING, J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, DISSENTING:**

¶40.    Because Chad Booker was entitled to a directed verdict of acquittal, I dissent.

¶41.    In *Weathersby v. State*, 147 So. 481, 482 (Miss. 1933), this Court held that:

> [i]t has been for some time the established rule in this state that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

¶42.    In a recent decision, this Court acknowledged that "[t]he *Weathersby* rule is alive and well and living in the courtrooms of this state." *Johnson v. State*, 987 So. 2d 420, 424 (Miss. 2008) (quoting *Heidel v. State*, 587 So. 2d 835, 839 (Miss. 1991)). "The *Weathersby* principle is not to be casually applied, but when the facts warrant, it becomes efficacious." *Dew v. State*, 309 So. 2d 857, 857 (Miss. 1975) (citations omitted). Moreover, "[w]here the *Weathersby* rule applies and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal." *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994) (citing *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989)). However, "where the defendant's story is materially contradicted, the *Weathersby* rule has no application and the matter of conviction versus acquittal becomes a question for the jury." *Id.* "*Weathersby* . . . is nothing more than a particularized version of our general standards according to which courts must decide whether in a criminal prosecution the accused is entitled to a judgment

of acquittal as a matter of law." ***Johnson v. State***, 987 So. 2d at 425 (quoting ***Jackson v. State***, 551 So. 2d 132, 136 (Miss. 1989)).

¶43.   In ***Dew***, the accused was tried for the murder of his wife. ***Dew***, 309 So. 2d at 857. Dew was convicted of manslaughter and sentenced to serve eight years in the state penitentiary. ***Id.***  At trial, Dew testified that no other individual had been present when he accidentally shot and fatally wounded his wife. ***Id.***  Dew was the only person to testify to the events leading up to his wife's demise. ***Id.*** at 858.  He said that he was in bed when his wife returned home from an outing with friends, and that he believed she was intoxicated. ***Id.***  Dew said that his wife was argumentative and that she had struck him several times during the confrontation. ***Id.***  Because of his wife's behavior, Dew said that he had instructed her  to go to her mother's home until the next morning. ***Id.***  She refused and attempted to strike Dew again.  He blocked the blow, and she seized him by the neck and scratched him. ***Id.*** Dew said that he had been able to push her away, but that she then had picked up a pistol that was lying on the night stand and threatened to kill him. ***Id.***  During the ensuing struggle over the gun, it accidentally discharged, according to Dew, and the bullet struck his wife. ***Id.***  Dew said that he immediately had called for an ambulance and notified the sheriff's department of what had transpired. ***Id.***

¶44.   On appeal, this Court reversed Dew's conviction and sentence, holding that the ***Weathersby*** rule applied to his case, that Dew's testimony had not been "controverted in its material particulars by either the physical facts or those of common knowledge," that the trial court had erred when it had not sustained Dew's motion for a directed verdict, and this Court rendered judgment for Dew.

21

¶45.   More recently, in *Johnson*, the accused had been visiting this state for the funeral of his grandmother when he and several other individuals were asked to help Johnson's aunt move out of her apartment complex. *Johnson*, 987 So. 2d at 423.  While Johnson was helping his aunt move, Dennis Davis initiated several confrontations with Johnson prior to the altercation that resulted in Davis's death.  *Id.*  Johnson testified that he and Davis's girlfriend had been helping his aunt move out of her apartment, and that when they had finished packing the apartment's contents, Johnson and Davis's girlfriend had begun walking to a convenience store to purchase beer.  *Id.*  Johnson said that he did not feel comfortable walking to the convenience store in the dark following the events that had transpired with Davis throughout the day, so he decided to carry a knife with him.  *Id.* Johnson said that, as he and Davis's girlfriend were walking to the store, Davis came toward them quickly and struck the woman in the face with a dark object.  *Id.*  Johnson said that he pled with Davis not to hit the woman again and then stepped between Davis and the woman. *Id.*  At that time, the woman walked away from Johnson and Davis.  *Id.*  Johnson testified that Davis then had made a swinging motion toward him with a dark weapon in his hand. *Id.*  In response, Johnson stabbed Davis one time.  *Id.* at 424.  The woman had fled a short distance away from Johnson and Davis and did not see the altercation.  *Id.*

¶46.   Following the stabbing, Johnson approached a nearby residence to ask the occupants to call 911, but he received no response from the occupants of that residence.  *Id.*  Johnson then went to his aunt's apartment and called 911, seeking help for Davis.  *Id.* Johnson was indicted for the murder of Davis.  *Id.*  Johnson was convicted of manslaughter and sentenced to serve twenty years in the custody of the Department of Corrections. *Id.*  Johnson filed a

22

post-trial motion for a new trial or a judgment of acquittal notwithstanding the verdict, which was denied. *Id.*

¶47.   On appeal, this Court held that "Johnson's reasonable eyewitness account, not substantially contradicted in material particulars, coupled with the pertinent circumstances which corroborated it . . . , collectively sustain a sufficient case of self-defense." *Id.* at 426 (citing *Weathersby*, 147 So. at 482). Accordingly, Johnson's version of events was required to be accepted as true, and it provided an absolute legal defense to either murder or manslaughter. *Id.* (citing *Weathersby*, 147 So. at 482; *Green*, 631 So. 2d at 174). Further, having taken "the transcript of the evidence by the four corners, . . . the *Weathersby* rule is clearly applicable, as the necessary elements for either a murder or manslaughter conviction were lacking . . . . Johnson was entitled to a directed verdict of acquittal." *Id.* (citing *Houston v. State*, 78 So. 182, 183 (Miss. 1918); *Blanks*, 547 So. 2d at 33).

¶48.   Chad Booker, like Dew and Johnson, was the only living witness to the homicide in question. In addition to Booker's testimony, numerous witnesses testified about Booker's demeanor from March 10 to March 12, 2007, and other witnesses testified that Booker had a good reputation for veracity and peacefulness within the community.

¶49.   Tyler Medlin, Booker's passenger in the Ford Mustang on March 10, 2007, testified that Booker was calm throughout the earlier exchange between David White and Booker on that day, and that Booker had not threatened White, that he had not raised his voice to White, and that he had told White to call the law if there was a problem with his rate of speed.

¶50. Rickey Thrasher, the manager of the Discount Auto Parts store in Ripley, Mississippi, testified that Booker had come into the store on March 12, 2007, at approximately 4:30 p.m., to talk about a paint problem on a 1960s model Ford pickup truck. Thrasher said that their conversation had drifted from Booker's paint problem to a general conversation about "how you get along with folks." Thrasher said that he and Booker had begun to talk about a neighbor of Booker's who had flagged Booker down over the weekend because the neighbor had thought he was traveling too fast and that the vehicle was too loud. Booker never told Thrasher that the neighbor of whom he spoke was David White. Thrasher said that Booker had maintained a pleasant demeanor during their conversation, and that Booker never appeared upset and never spoke ill of the neighbor. Thrasher further testified that he had known Booker approximately twenty years, and that Booker was an honest man and a good customer. Thrasher also testified that Booker had a good reputation for telling the truth and that he had never heard anyone speak negatively of Booker.

¶51. After leaving the auto parts store, Booker went across the street to Southern Discount Motors to see Phillip Nance. Booker testified that he and Nance were friends and that he looked up to Nance. Booker said that he had expressed to Nance that he did not understand why White had become so upset about him on Saturday. Nance gave a statement to Officer John Hillhouse on May 3, 2007. Prior to trial, Nance died. At trial, Officer Hillhouse read Nance's statement into the record. In his statement, Nance said that Booker had come over to show him the orange paint job on the Ford pickup truck, and that he and Booker had talked about the truck and the superb paint jobs Booker was capable of producing. Nance said that as Booker was leaving, he mentioned that White had flagged him down and reprimanded him

for driving too fast, and that Booker was puzzled about why White would have been so upset about his driving. Nance said that Booker made no comments about getting even with White, and he never threatened to harm White.

¶52. Booker testified that after he left Nance's used-automobile dealership on March 12, 2007, he drove the orange Ford pickup truck to his home, parked it under his carport, then drove his red Chevrolet Z-71 pickup truck from his house to his shop. Booker said that, after he had parked his Chevrolet pickup truck at his shop, he went to his blue Nissan "garbage truck" that was parked just outside the gate to his shop. Booker said that he had begun picking up garbage and putting it into the back of the Nissan truck. While Booker was picking up garbage, he saw David and Keith White driving on County Road 813. When he saw the Whites approaching, he said he "spoke," meaning that he had waved his hand in the air as the Whites' vehicle approached him. Booker said that Keith White spoke back by waving his hand as they drove past Booker. Keith testified that both he and his father had spoken to Booker as they had driven past him on County Road 813.

¶53. Booker said that, soon after the Whites had passed him on County Road 813, he had seen White "coming in real fast in his Yamaha Rhino," and that he had been confused about why White was coming onto his property. Booker said that White parked the Rhino near the Nissan truck, turned the Rhino off, got out of the Rhino, and said "Hey, I got [to] talk to you." Booker responded by saying "Mr. White, I don't want any problems with you. Just leave. Leave my property. I don't want any problems with you." White said, "[h]ell naw. You're going to talk to me." Booker said that "[White] reached up to grab my collar, and when he did, he went to punch me with his other hand; and I caught his wrist and twisted it

25

. . . and I punched him three times and turned him loose." Booker said that "I turned him loose and he stumbled and I remember him standing on his feet and going to his Rhino to get back on it, and I turned around and I started walking down the road because I got scared and wondered what was fixing to happen next. I was upset." Booker said that he had not tried to hurt White; rather, he had been trying to defend himself. Once Booker had learned of White's injuries, he voluntarily turned himself in to Tippah County sheriff's deputies.

¶54. Booker and White were the only people present at the time of the altercation. No other trial witness was able to testify regarding the events that had occurred outside Booker's shop on the evening of March 12, 2007. Additionally, Booker and White exhibited injuries that were consistent with Booker's testimony. Specifically, Booker's hand had become swollen and was beginning to bruise at the time he gave his statement, and White had an injury on his right hand that was consistent with his having punched someone. Moreover, the State offered the testimony of Dr. Steven Hayne, a pathologist, to support its theory of the case; however, the witness admitted that Booker's version of events could not be excluded, and in fact was a "distinct possibility." The following exchange took place between the State and Dr. Hayne:

State: Based on your observation of Mr. White, would you expect that a person in a standing position who received this amount of force to the head could remain standing when receiving that lick?

Hayne: It would be unlikely . . . unless he was supported by some means. If there's more than one blow, then I would expect the person to fall unless supported.

However, the following exchange occurred between defense counsel and Dr. Hayne on cross-examination:

26

Defense: . . . [M]y question to you is this: If we have testimony that Mr. White got out of his vehicle and accosted the defendant, grabbed him and swung at the defendant, and the defendant caught his hand, the swing by Mr. White, and he grabbed Mr. White and pulled him to him and hit him three times and released him, and that Mr. White did not go down but Mr. White went back and got in his vehicle, you can't contradict that that occurred, can you, if that's what the proof shows?

Hayne: I cannot exclude that, Counselor, but again, I would not favor that scenario.

Defense: But you weren't there, were you?

Hayne: No, sir.

Defense: Okay. And your medical findings don't exclude that, do they?

Hayne: They do not, but they would lean strongly against it.

Defense: But you can't swear under oath it didn't happen, can you?

Hayne: No, I cannot do that.

Defense: And people who have had concussions have walked around before like in football, high school football, for instance?

Hayne: They have, but by definition, they're going to have a momentary period of unconsciousness by definition.

Defense: And you believe in this particular case that Mr. White would have had a moment of unconsciousness?

Hayne: Yes, sir.

Defense: And then been conscious again?

Hayne: That's a possibility, Counselor. He could have remained unconscious. That is certainly a distinct possibility.

Defense: But it's also a distinct possibility he could have regained consciousness?

Hayne: That's possible, Counselor, for a very short period of time.

Defense: Right. Regained lucidness, correct?

Hayne: I used the term lucid, yes.

Defense: Yes, sir. You found an injury on Mr. White?

Hayne: I found a bruise located on the back of the third finger of the right hand.

. . .

Defense: Would that be consistent with throwing a blow?

Hayne: It would be consistent with it, Counselor.

Defense: And you believe that that injury occurred close in time?

Hayne: I would rule it at or about the time of death. Of course, there are other explanations for that injury too.

Defense: Sure. But you couldn't exclude it as Mr. White throwing a punch, could you?

Hayne: I could not, sir.

¶55. At trial, Booker addressed the White family and apologized for what had happened to David White. However, Booker maintained that he had acted in self-defense and had not intended to hurt White. Further, Keith White and Charlotte White testified that they had never had problems, be it violence or otherwise, from their neighbor, Chad Booker. Moreover, numerous witnesses testified that Booker had not been angry or disrespectful to White prior to the altercation, and that Booker had not expressed any desire to retaliate against White for the events of Saturday, March 10, 2007.

¶56. The majority opined that the dispute between White and Booker on March 10, 2007, had not ended when Booker drove back to his auto shop after being accosted by White; rather, it carried on through the evening of March 10, 2007. Maj. Op. at ¶ 5. To support that opinion, the majority points to allegations of Keith White, David White's son, to show that, after David White told Booker to slow down, Booker drove his red Chevrolet pickup truck on County Road 813 in front of David White's home approximately four times on the evening of March 10, 2007, and that each time Booker passed White's home, he would stop at the end of White's driveway, put the truck in neutral and rev the engine. Maj. Op. at ¶ 5. Keith White further testified that he heard Booker yell "f— you" on the fourth time that Booker drove past the White driveway. Maj. Op. at ¶ 5. Booker denied those allegations.

¶57. The majority also points to the testimony of Shade White, David White's grandson, to illustrate that the dispute between David White and Booker had not ended when Booker went back to his shop after being confronted by David White on March 10, 2007. Maj. Op. at ¶ 5. Shade White testified that, near 11:00 p.m. on March 10, 2007, he heard the engine of a truck that he believed to be Booker's revving up outside his bedroom window.

28

However, defense counsel elicited testimony from Shade White to demonstrate that he, in fact, did not know whether the vehicle he had heard belonged to Booker, and he did not know whether Booker was driving the vehicle that he had heard that night.

¶58. Even if Shade White had maintained that the truck that he had heard outside his bedroom window on March 10, 2007, was Chad Booker's and that Booker was actually driving the vehicle, Booker had an alibi and an alibi witness whose testimony contradicted that of Shade White. Booker's alibi was that he was neither at home nor in the City of Ripley at the time of the alleged annoyance outside of Shade White's bedroom window. Amy Estes testified that on March 10, 2007, she met Booker and Shanna Vuncannon at 8:00 p.m. in the Wal-Mart parking lot in Ripley, Mississippi. Estes said that they left Ripley in Vuncannon's vehicle and went to the Ruby Tuesday's restaurant in Corinth, Mississippi. Estes further testified that she, Vuncannon, and Booker had left the Corinth restaurant at approximately 11:30 p.m., and that it was after 12:00 a.m. when they returned to Ripley.

¶59. Booker's reasonable eyewitness account was "not substantially contradicted in material particulars," and the "pertinent circumstances corroborate" his version of events, which would "collectively sustain a sufficient case of self-defense." *Johnson*, 987 So. 2d at 426. Therefore, Booker's version of events was required to be accepted as true, and it provided an absolute legal defense, namely self defense, to either murder or manslaughter. *Id.* Moreover, having taken "the transcript of the evidence by the four corners, . . . the *Weathersby* rule is clearly applicable, as the necessary elements for either a murder or manslaughter conviction were lacking. *Id.* Accordingly, Booker was entitled to a directed

29

verdict of acquittal. The judgment of the Court of Appeals and the trial court's conviction and sentence should be reversed, and the case should be rendered in favor of Booker.

**DICKINSON, P.J., AND CHANDLER, J., JOIN THIS OPINION.**