594 So.2d 20 (1992)
John Michael JACKSON
v.
STATE of Mississippi.
No. 90-KA-1011.
Supreme Court of Mississippi.
January 22, 1992.
*21 J. Niles McNeel, McNeel & Ballard, Louisville, for appellant.
Mike C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and BANKS and McRAE, JJ.
BANKS, Justice, for the Court:
John Michael Jackson seeks reversal of his conviction of aggravated assault upon his ex-wife with whom he was living and the five (5) year sentence imposed in its wake. He raises two issues: (1) whether the indictment for aggravated assault was fatally defective because it failed to allege that a weapon other than hands and fists was used to inflict the victim's injuries; and (2) whether the trial judge unduly limited Jackson in the presentation of evidence regarding the totality of events on the evening of the assault when it sustained three (3) objections by the State to testimony concerning a post-assault scuffle between the defendant and the victim's brother and stepfather. Finding no error we affirm.

I. Facts
John Michael Jackson has been convicted of inflicting bodily injury to Tammy Jackson, his ex-wife, with hands and fists, a means likely to produce serious bodily harm. Michael and Tammy were legally divorced at the time of the assault but had reconciled to the extent that Jackson was staying at Tammy's home in Ackerman, Mississippi.
The evidence established that Michael arrived at Tammy's house in Ackerman around midnight on the evening of the assault, after having been left by Tammy at a bar in Columbus. While present at this nightclub, Tammy had indicated she was ready to go home but Michael, who was drunk, talking crazy, and scaring Tammy, refused to leave. Although Tammy admitted *22 she left him stranded, Tammy attempted, albeit unsuccessfully, to obtain a ride for him back to Ackerman.
Tammy was asleep on the couch around midnight when Michael broke into the house through the carport door and headed straight for her bedroom. Tammy awoke from her slumber, escaped out the carport door, and, clad only in a night shirt, panties, and socks, ran toward the home of Joyce Carson, her neighbor. Michael pursued Tammy and overtook her inside the carport before Tammy reached the door. Michael, less than gingerly, began to drag her back toward her own home.
We interject at this point that Tammy is afflicted with a muscular disorder which causes her muscles to become progressively weaker as she exerts herself. As Tammy screamed for assistance from Joyce Carson, Michael began hitting Tammy and telling her to "shut up." Tammy sprayed mace in Michael's face which infuriated him. He took the mace from her, sprayed some of it inside her mouth, and began to drag her across the driveway to the house skinning her bare back in the process. Once reaching the carport, Michael grabbed Tammy by one leg and by the hair of her head and tossed her inside the kitchen. While Michael was washing the mace from his face, Tammy went to her bedroom and locked the door behind her. She telephoned Joyce Carson and Kenneth Jackson, Michael's father, and told him to come over at once.
Before Tammy could hang up the telephone, Michael broke through the bedroom door and asked her who she had called. When Tammy told him she had called his daddy, Michael became even more enraged. "Why'd you do that? Why'd you do that?," he screamed as he broke the telephone cord.
Tammy ended up on the floor next to the bed with Michael straddled over her. He screamed at her, began to hit her in the head with his fist "real hard", and called her a "stupid bitch." While Tammy was leaning against a wall, Michael, with his hand around her neck, began to bang her head against the wall over and over and to curse her. According to Tammy's testimony, this headbanging "seemed like forever." The repeated impact of her head against the wall created a split in the wall. The last thing Tammy remembers is looking up and seeing Michael's father come into the room.
Tammy finally escaped from the house and was later taken by neighbors to the emergency room where she was examined by Dr. Parsons. She could not hear out of her left ear which was hurting, and her "whole head felt like it was just exploding." As of trial, she was still experiencing pain in that ear.
A concise description of the blows to Tammy's head is found in the following colloquy:
Q When the Defendant hit you the first time in the bedroom, what did he hit you with?
A His fist.
Q When you say a fist, would you describe what you mean by that?
A A closed hand.
Q Where did he hit you?
A In my head.
Q Where in the head did he hit you?
A Like on the side of my head and the back part.
Q You're indicating around the left side and back of the head? When he hit you there in the head, what did it do to you?
A It hurt. But, it didn't knock me out.
Q Were you standing up or seated when he hit you?
A I was in the floor. He was down over me. I was kind of in a sitting position. I wasn't laying down flat. I was in the floor.
Tammy suffered multiple bruises and contusions to her face, the left side of her head, left ear, back, legs, and to her upper body. She also suffered a subconjunctival hemorrhage of the left eye and a definite rupture of the left eardrum which was serious enough to require surgical repair. Tammy was hospitalized for thirty-six (36) hours.

*23 II. Simple or Aggravated Assault?

Jackson claims his indictment for aggravated assault was fatally defective because it failed to allege that a deadly weapon was used to inflict the victim's bodily injuries. Because the assault consisted largely of blows administered by hands and closed fists, Jackson contends his crime, at best, was simple assault, a misdemeanor. Specifically, he contends the trial judge, as a matter of law, should have sustained his motion to reduce the charge from aggravated assault to simple assault. We disagree.
By virtue of Miss. Code Ann. § 97-3-7(1)(a) (Supp. 1991), a person is guilty of simple assault if he "purposely, knowingly or recklessly causes bodily injury to another." By virtue of § 97-3-7(2)(b) (Supp. 1991), "[a] person is guilty of aggravated assault if he ... purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm." [emphasis supplied]
The indictment in this case charged "that John Michael Jackson... on or about January 21, 1990, ... did unlawfully, feloniously, purposely and knowingly cause bodily injury to Tammy L. Jackson ... with a means likely to produce serious bodily harm, by striking the body of Tammy L. Jackson with his hands and closed fists and throwing her against a wall, thereby causing the rupturing of her left eardrum, ... ."
Jury instruction S-1 authorized the jury to return a verdict of guilty of aggravated assault if it believed from all the evidence beyond a reasonable doubt "... the defendant ... did unlawfully, feloniously, purposely and knowingly cause bodily injury to Tammy L. Jackson; and any such bodily injury was caused with a means likely to produce serious bodily harm."
Jury instruction S-2, on the other hand, authorized the fact finder to return a verdict of simple assault if it found the evidence of aggravated assault lacking. S-2 instructed the jury that simple assault is distinguished from aggravated assault "by the absence of proof or the failure to prove that any bodily injury was caused with a means likely to produce serious bodily injury."
The centerpiece of Jackson's argument is that hands and fists can never constitute "a means likely to produce death or serious bodily harm" to the victim. Jackson claims that fighting with fists falls invariably into the category of simple assault. We cannot agree. While ordinarily an assault under § 97-3-7(2)(b) involves the use of a weapon, the statutory words "or other means likely to produce death or serious bodily harm" have been used with a definite purpose and meaning in mind. We hold that a violent and aggravated assault committed with one's fists may constitute a crime under § 97-3-7(2)(b).
Indeed, our cases make this perfectly clear. In Blaine v. State, 196 Miss. 603, 608-09, 17 So.2d 549, 550 (1944), decided under our former law defining assault and battery with intent to kill but applicable, nevertheless, to the new law and the facts before us, the defendant argued that a battery with hands and feet was not a "means or force likely to produce death." We said that "[s]uch contention would be cogent only in the event (1) such means were never likely to produce death; or (2) such means as here used were not so."
This Court quickly dispensed with the first alternative by observing that "common knowledge," buttressed by murder convictions, shows that the use of hands and feet can likely produce death. We then noted the second alternative necessarily involved a question of fact "to be resolved according to the circumstances of each case."
The verbiage of the statute appears not to have been selected hap-hazardly. It does not restrict the means to deadly weapons nor to an assault with intent to kill, nor does it require probability of death. The word "likely" borrows meaning from both possibility and probability and stands midway their respective connotations. So defined, in all cases save those bespeaking absurdity, the responsibility for adjudging likelihood remains with the jury, which may be left free to give due weight to *24 the parties, the place, the means used, and the degree of force employed. [emphasis supplied]
Similarly, in Johnson v. State, 230 So.2d 810, 811 (Miss. 1970), we said that "[w]hether [a shoe clad foot] is, in a given case, a means or force likely to produce death, within the meaning of the statute, is a matter for the determination of the jury, in the light of evidence as to how and in what manner it is employed."
Finally, in Pulliam v. State, 298 So.2d 711, 713 (Miss. 1974), a case also decided under our former statute, we reaffirmed the role of the jury.
While the use of feet and fists ordinarily would not constitute the use of a deadly weapon, they can constitute a deadly weapon if used with means or force likely to produce death. Whether they are so used is for the jury to determine from the evidence. [emphasis supplied]
It is not necessary under § 97-3-7(2)(b) that the use of hands and fists constitute the use of a "deadly weapon;" rather, it is enough if their use constitutes a "means likely to produce [either] death or serious bodily harm." Nor is it necessary under this section for the State to prove the victim suffered "serious" bodily injury. Mere "bodily injury" is sufficient so long as it was caused with "other means likely to produce death or serious bodily harm."
We hold that whether or not hands and closed fists constitute, under § 97-3-7(2)(b), a "means likely to produce serious bodily harm" involves a question of fact to be decided by the jury in light of the evidence. The responsibility for determining likelihood remains with the jury which may be left free to give due weight to the characteristics of the parties, the place, the manner in which hands and fists are used, and the degree of force employed.
Accordingly, evidence of a beating with closed fists is sufficient to sustain a charge for aggravated assault. Since this is true, the indictment here was not defective, and the trial judge correctly refused to reduce the charge pending development of the evidence.
In the case at bar, the evidence demonstrated an assault which was not only "likely to" produce serious bodily harm but actually did produce serious bodily harm. Dr. Parsons testified a ruptured ear drum "can be serious in the respect that you can lose a great deal of hearing if the ear drum remains ruptured and ... does not heal or is not repaired surgically."
Tammy Jackson was hospitalized for thirty-six (36) hours, and the traumatic rupture of her ear drum required surgical intervention by an ear specialist. The defendant testified he was aware that Tammy had been seriously injured and that he was sorry for what he had done.
Johnson's reliance upon Brooks v. State, 360 So.2d 704 (Miss. 1978) is misplaced. In that case Brooks was indicted under § 97-3-7(2)(a) for attempting to cause "serious" bodily injury to another by hitting a female with hands, arms, fists, and with books. We held there was insufficient evidence to demonstrate that Brooks attempted to cause serious bodily injury. The victim's injuries were not serious.
Brooks is important in our context only for what it did not hold. We did not say that hands and closed fists could never constitute a means likely to produce death or serious bodily harm. We simply were unable to conclude "in these particular circumstances that the book used in the attack constituted a `deadly weapon or other means likely to produce death or serious bodily harm.'" Moreover, we noted there could only be conjecture as to Brooks' intent because the victim's injuries were not serious.
Johnson's intent, on the other hand, was clear. He was drunk and violent and pummeled the victim with hands and closed fists because she left him in Columbus and because she telephoned his daddy. He sat astraddle the victim while he hit and cursed her. He later held his hand around her neck while he repeatedly banged her head against the wall. The force exerted was sufficient to place a dent or split in the wall following impact. Because of her neuromuscular condition, the victim was too tired to resist.
The jury was properly instructed and asked to determine whether or not the defendant's *25 actions constituted aggravated or simple assault. It resolved the issue adversely to the defendant, which was their prerogative. We hold the jury's resolution of the issue in favor of a finding of aggravated assault is supported by the evidence.

III. Evidentiary Rulings
Jackson contends the trial court erred in not permitting him to develop the post-assault events ensuing at Tammy Jackson's house after the arrival of Junior Cagle, Tammy's stepfather, and Rusty Bowman, Tammy's brother. Specifically, he claims that testimony describing a post-assault scuffle involving Cagle and Bowman and Michael and his father was relevant "to show that Tammy Jackson was influenced and her testimony biased because her stepfather and brother have hard feelings toward Michael." Neither Junior Cagle nor Rusty Bowman testified in this cause.
We have carefully examined the official record. Objections notwithstanding, the jury was amply informed about the fight which took place between the two Jacksons and Cagle/Bowman after Tammy had already left the house.
By virtue of Rule 103(a), Miss.R.Evid., "[b]efore error can be predicated at all upon an adverse evidentiary ruling, it must appear that a substantial right of the party is affected." Sayles v. State, 552 So.2d 1383, 1387 (Miss. 1989). Put another way, "the admission or exclusion of evidence must result in prejudice and harm, if a cause is to be reversed on that account." Knight v. State, 248 Miss. 850, 161 So.2d 521, 522 (1964). Any error in sustaining the objections made by the State was either cured or rendered harmless beyond a reasonable doubt.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.