CARLTON, J.,
specially concurring:
¶ 48. I concur with the decision of the majority. I submit that the record contains sufficient evidence from which the jury could find beyond a reasonable doubt that Shaw committed aggravated assault by using his teeth to tear off a portion of Killingsworth’s ear. See Williams v. State, 94 So.3d 324, 329-30 (¶ 20) (Miss.Ct.App.2011). Under the applicable standard of review, the evidence in the record is sufficient, and logical inferences may be drawn therefrom, for the jury to conclude that Shaw — not Killingsworth — acted as the initial aggressor in the aggravated assault. Accordingly, I concur with the majority’s decision to affirm the trial court’s judgment and convictions as to both counts — malicious mischief, and aggravated assault. I specially concur with the majority and write separately to address the sufficiency of the evidence and the jury instructions in this case.
¶ 49. Shaw was charged with malicious mischief pursuant to Mississippi Code Annotated section 97-17-67 (Supp.2012) and *92 aggravated assault pursuant to Mississippi Code Annotated section 97-8-7(2)(b) (Rev. 2006). Section 97 — 3—7(2)(b) provides that “[a] person is guilty of aggravated assault if he ... attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm.” Shaw’s indictment stated that he purposely or knowingly “[bit] a portion of Killingsworth’s right ear off, a means likely to produce death or serious bodily harm.”[3]
¶ 50. I recognize that each witness testifies according to his or her own particular perception and memory of an event and memory thereof, and that it is the province of the jury to resolve conflicts in testimony and to determine credibility. I now turn to review evidence in the record supporting the conviction for aggravated assault, which includes testimony from Killings-worth, the victim, as determined by the jury; Patterson, Shaw’s girlfriend; eyewitnesses including Dortch and Hunter El-ward; three law enforcement officers; as well as medical testimony and automobile-damage-valuation testimony.
¶ 51. The transcript shows that before arriving to the party at Ian’s apartment on July 18, 2010, Shaw revealed to his girlfriend (Patterson) his intent and desire to fight Killingsworth. Shaw explained that Killingsworth’s constant bragging about his- car angered Shaw. Killingsworth testified that during the party, he went outside because a neighbor told him that Shaw was jumping up and down on his car. Killingsworth testified that he saw the damage to his car, and he immediately asked Shaw why he damaged the car. According to Killingsworth’s testimony, Shaw stood aggressively close to Killingsworth’s face. Killingsworth testified that he told Shaw to get out of his face, and stated that he did not want to fight Shaw. However, Shaw responded by telling Killingsworth that he was already in his face. These actions by Shaw provide sufficient evidence to show that he acted with the requisite general intent. See Bright v. State, 986 So.2d 1042, 1046 (¶ 13) (Miss.Ct.App.2008) (“Intent is determined by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent.”).
¶ 52. • Killingsworth testified that he tried to get Shaw to calm down, so he pushed him against the vehicle and held Shaw there in an effort to prevent Shaw from hitting him. Killingsworth admitted at trial that he made the first contact between himself and Shaw by pushing Shaw out of his face in order to hold him down. Killingsworth claimed that Shaw’s friend Gill came from behind him while he was holding Shaw. Gill then hit Killings-worth, so Killingsworth tried to stop Gill from hitting him. Once Killingsworth turned back around to where he was holding Shaw, Shaw bit Killingsworth on the ear, as well as under the arm.
¶ 53. Killingsworth testified that he tried to get Shaw off of him, and stated that Shaw would not quit biting him. Kill-ingsworth’s statement to the police, introduced during cross-examination, reflected that Killingsworth punched Shaw a couple of times in an attempt to get Shaw to release his bite hold on Killingsworth’s ear. Killingsworth stated that he “wrapped [Shaw] back up,” holding him on the ground. Shaw’s bite hold on Killings-worth’s ear was too tight and strong, re- *93 suiting in Shaw ripping off Killingsworth’s ear. The police then arrived and found Killingsworth and Shaw on the ground.
¶ 54. With respect to other testimony in the record that also supports the jury’s verdict and provides evidence that Shaw acted as the initial aggressor and with the requisite general intent, I note that Dortch, an eyewitness, testified that Shaw acted hostilely earlier at the party and verbally expressed his desire to fight Kill-ingsworth. Shaw. kept asking Killings-worth to go outside to fight. Dortch separated the two, testifying that he took Shaw outside and Killingsworth stayed inside. As to Shaw’s demeanor, Dortch testified that Shaw seemed angry and hostile, but that Killingsworth was not angry. Dortch also testified that he observed Shaw throw the first punch, but he stated that Killings-worth just kept telling Shaw that he did not want to fight. Dortch’s testimony that he witnessed Shaw throw the first punch was consistent on cross-examination, and established that Dortch was consistent as to this claim in his pretrial written statement to law enforcement.
¶ 55. Hunter, another eyewitness, heard Shaw yelling, “Bring it on. Do something. Let’s see what you got.” Hunter saw Shaw take his shirt off and beat his chest “like a gorilla.” Shaw began jumping around, whooping, and hollering. Shaw jumped on the hood of Killings-worth’s car and began slamming his feet into the hood. Shaw jumped off the car and Killingsworth came outside. Hunter heard Shaw yell profanity, and he heard Killingsworth ask why Shaw jumped on his car. Hunter also heard Killingsworth tell Shaw that he did not want to engage in a fight with him. Hunter stated that Shaw acted as the initial aggressor by punching Killingsworth. Hunter explained that he saw Shaw rare back to punch Killings-worth, and prior to that action, Killings-worth had not made any aggressive moves towards Shaw. Killingsworth grabbed Shaw in self defense, and the two began to tussle shortly before Killingsworth slammed Shaw into the ground. Hunter stated that he saw the two holding each other in a headlock on the ground, and it appeared that Killingsworth was trying to prevent Shaw from doing anything. Hunter heard Killingsworth yell that Shaw had bitten his ear. Hunter saw blood on both Shaw and Killingsworth. Hunter testified that the police arrived about two minutes after Shaw bit a portion of Killingsworth’s ear off.
¶ 56. Lieutenant East of the Richland Police Department testified that when he arrived to the scene, Killingsworth and Shaw were on the ground fighting, and he observed Killingsworth trying to hold Shaw down. Both Lieutenant East and Officer Frank Craft, also of the Richland Police Department, testified that Shaw did not appear to be injured upon their arrival. Shaw provided a statement to the police stating that he was too drunk to remember the events of the night, but he stated that he did remember denting Killingsworth’s car before getting into a fight and biting off part of Killingsworth’s ear. Both officers testified that Shaw was defiant and uncooperative upon their arrival at the scene.
¶ 57. In jury instruction 9, the jury was instructed:
[I]f you believe from the evidence that [Killingsworth] was the aggressor in this case, and-if you further believe from the evidence that [Killingsworth] was a much larger and stronger man than [Shaw], and was capable of inflicting great and serious harm upon [Shaw] with his hands and that [Shaw] had reason to believe and did believe as a man of ordinary reason that he was in imminent danger of such harm at the hands *94 of [Killingsworth], and that [Shaw] used his teeth to protect himself from such harm, then it is your duty to find [Shaw] not guilty.
¶ 58. Jury instruction 10 also properly informed the jury that the law in Mississippi provides than an initial aggressor is not entitled to assert the defense of self-defense. Similarly, and without objection, the court instructed the jury in instruction 12 that voluntary intoxication failed to provide a defense to the charge of aggravated assault or malicious mischief in Mississippi. See Harper v. State, 853 So.2d 1286, 1288 (¶ 7) (Miss.Ct.App.2003) (holding that failure to make a contemporaneous objection at trial waives review of the issue on appeal). Voluntary intoxication provides no defense to these offenses since they both constitute general-intent crimes. See Wales v. State, 73 So.3d 1113, 1121 (¶ 22) (Miss.2011) (holding that intent can be inferred from evidence of the defendant’s actions); Bright, 986 So.2d at 1046 (¶ 13) (aggravated assault is a crime of general intent); Griffin v. State, 872 So.2d 90, 91-92 (¶¶ 4-5) (Miss.Ct.App.2004).
¶ 59. I submit that the testimony of the eyewitnesses and the victim indeed provided a sufficient evidentiary basis for the jury to find that Shaw acted as the initial aggressor. During the party, Shaw put his intent on display through his hostile behavior of stomping on Killingsworth’s car and getting in his face to pick a fight. See Wales, 73 So.3d at 1121 (¶ 22); Chambliss v. State, 919 So.2d 30, 35 (¶ 15) (Miss.2005) (questions of a defendant’s intent and knowledge are questions for the jury). The record shows that an expert in auto-body-repair valuation also testified as to the damage of the victim’s car. Eyewitnesses also established that Shaw tried to fight Killingsworth most of the evening, and that Killingsworth repeatedly told Shaw that he did not want to fight. Kill-ingsworth and the eyewitnesses testified that Shaw threw the first punch.
¶ 60. Jury instruction 11 instructed the jury that “serious bodily harm is bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.” Jury instruction 11 further instructed that it was for the jury to determine whether or not biting off part of Killingsworth’s ear, as alleged in this case, constituted a “means likely” to produce serious bodily harm.[4] With respect to jury instruction 11, the record shows that during the court’s conference on jury instructions with counsel for both the State and Shaw, the court requested that counsel submit an instruction that defined “means likely” and also informed the jury that it was their duty to determine whether or not biting off someone’s ear is a “means likely” to produce serious bodily harm. The jury-instruction conference reflects that the court considered case law in its determination of the instructions regarding the law on “means likely” and in the area of initial aggressors in assaults.[5] The court explained that the case law reflected that “means likely” constituted a jury *95 question.[6] The defense raised no objection, and when the amended jury instruction S7(a) was offered to the court with the definition of “means likely” contained therein, the defense accepted the instruction. The court then accepted instruction S7(a), which was presented to the jury as instruction 11. See Foster v. State, 639 So.2d 1268, 1289 (Miss.1994) (“A defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal.”).
¶ 61. In examining the evidence of the serious bodily harm of disfigurement resulting from the aggravated assault, the record includes photographs of Killings-worth’s disfigured ear and testimony from Killingsworth, and medical testimony of Dr. Angel, showing that Killingsworth was missing seven and a half centimeters of his ear, which the record provides constitutes about the full length of his ear. The record shows that Killingsworth required surgery on his ear as a result of the injury. Clearly, disfigurement to the ear results when a person bites part of another’s ear off, and I submit that such permanent disfigurement of the ear constitutes a serious bodily harm,[7] satisfying the injury element of the aggravated-assault statute.[8]
¶ 62. The jury instructions in this case reflect that the trial court properly and thoroughly instructed the jury as to the State’s burden to prove each element of the charged offenses. . The jury instructions also reflect that the trial court properly and thoroughly instructed the jury as to the other issues raised by the evidence in this case. See O’Flynn v. Owens-Corning Fiberglas, 759 So.2d 526, 536 (¶ 31) (Miss.Ct.App.2000) (On appeal, jury instructions are reviewed as a whole to determine whether the instructions properly express the applicable law.).
¶ 63. Certainly, conflicting evidence was presented at the trial, but it is the job of the jury, and not the appellate courts, to determine credibility and resolve conflict in testimony. Nason v. State, 840 So.2d 788, 792 (¶¶ 14-15) (Miss.Ct.App.2003) (jury possesses the duty to resolve conflicts in testimony). The record reflects sufficient evidence to show that Shaw acted as the initial aggressor. Paraphrasing, the record shows that the jury was instructed in jury.instruction 9 that it was required find Shaw not guilty if it found *96 that Killingsworth acted as the initial aggressor and found that Shaw bit Killings-worth’s ear to protect himself because of his reasonable belief that he faced imminent danger of serious bodily harm from Killingsworth. The jury considered this instruction and rejected Shaw’s defense. Sufficient evidence exists in the record for the jury to have found beyond a reasonable doubt that Shaw acted as the initial aggressor by biting and aggressively hitting Killingsworth and damaging his ear. Sufficient evidence also exists for the jury to find that the State met its burden of proving each element of the charged offenses beyond a reasonable doubt.[9]
¶ 64. In the present case, the record shows that Shaw verbally expressed his intent to fight Killingsworth and then later engaged in a physical altercation with Kill-ingsworth, which caused Killingsworth serious bodily harm.[10] The evidence in the record more than sufficiently satisfied that amount of evidence which is required by our standard of review of a jury verdict to establish the defendant’s general intent to commit these offenses. I therefore concur with the majority’s decision to affirm the judgment of the trial court and the verdict of the jury. See Williams, 94 So.3d at 329-30 (¶ 20).
JAMES, J., JOINS THIS OPINION IN PART.

. See Chambliss v. State, 919 So.2d 30, 35 (¶ 15) (Miss.2005) (the questions of a defendant’s intent and knowledge are questions for the jury); Bright v. State, 986 So.2d 1042, 1046 (¶ 13) (Miss.Ct.App.2008) ("Intent is determined by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent.”).

. See Jackson v. State, 594 So.2d 20, 23 (Miss.1992) (supreme court held that an aggravated assault committed with one's fists may constitute a crime under Mississippi Code Annotated section 97—3—7(2)(b)); Johnson v. State, 230 So.2d 810, 811 (Miss.1970) (shoe-clad foot falls into category of other means); Adams v. State, 726 So.2d 1275, 1278-79 (¶ 8) (Miss.Ct.App.1998) (fist falls into category of other means); Harrison v. State, 724 So.2d 978, 984 (Miss.Ct.App.1998).

. See Manuel v. State, 667 So.2d 590, 592-93 (Miss.1995); See also Miss.Code Ann. § 99-17-19 (judge in a criminal case shall instruct the jury upon the principles of law applicable to the case).

. See Owens v. State, 763 So.2d 917, 920 (¶ 9) (Miss.Ct.App.2000).

. In Jenkins v. State, 913 So.2d 1044, 1048-49 (¶¶ 12-13) (Miss.Ct.App.2005), this Court clarified:
Both this Court and the Mississippi Supreme Court have held that when an individual is charged pursuant to Mississippi Code Annotated [section] 97 — 3—7(2)(b), the State need not prove the victim suffered "serious” bodily injury. In Jackson v. State, 594 So.2d 20, 24 (Miss. 1992), the Mississippi Supreme Court stated:
It is not necessary under [section] 97-3-7(2)(b) that the use of hands and fists constitute the use of a "deadly weapon”; rather, it is enough if their use constitutes a "means likely to produce [either] death or serious bodily harm.” Nor is it necessary under this section for the State to prove the victim suffered "serious” bodily injury. Mere "bodily injury” is sufficient so long as it was caused with "other means likely to produce death or serious bodily harm.”

.See Osborne v. State, 843 So.2d 99, 102 (¶ 11) (Miss.Ct.App.2003) (Evidence presented in support of an aggravated assault charge failed to warrant a lesser-included-offense instruction of simple assault; "[the defendant] was either not guilty since she claimed she did not know how [the victim] was injured and that she did not touch [the victim], or she was guilty of aggravated assault as she caused injury under circumstances manifesting extreme indifference to the value of human life using means likely to produce serious bodily harm.”).

. See Williams, 94 So.3d at 329-30 (¶ 20) (When considering whether the evidence is sufficient to support a conviction, “the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.”).

. See Chambliss, 919 So.2d at 35 (¶ 15); Bright, 986 So.2d at 1046 (¶ 13).