# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00649-COA

**DERRICK DEWAYNE MOFFITE A/K/A**          **APPELLANT**
**DERRICK DEWAYEN MOFFITE A/K/A**
**DERRICK D. MOFFITE**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/06/2018 |
| TRIAL JUDGE: | HON. LESTER F. WILLIAMSON JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES A. WILLIAMS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA TEDDER |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/03/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1. A jury of his peers convicted Derrick Moffite of aggravated assault on a correctional officer by putting her into a chokehold. The trial court sentenced him as a habitual offender to life imprisonment without eligibility for parole. Aggrieved, Moffite appeals, arguing (1) the evidence was insufficient to support an aggravated-assault conviction; (2) he was improperly indicted as a habitual offender; (3) the trial court improperly denied his proposed jury instructions; (4) the trial court was not impartial; (5) the State committed a discovery violation; and (6) he was improperly sentenced. Finding no error, we affirm.

## FACTS

¶2. While in custody at the Lauderdale County Detention Facility, Moffite made comments about committing suicide to a lieutenant, who immediately informed his superior. Moffite made statements such as "A life for a life," "I'm done," and "I have nothing else to lose." As a result, Sergeant Jodi Dowdy was ordered to place Moffite on suicide observation. Sergeant Dowdy, along with three other officers, tried to get Moffite to enter the suicide cell on his own accord. Moffite refused.

¶3. The officers then tried to physically place Moffite in the cell, but he managed to break away and chased Sergeant Dowdy. Another correctional officer heard Moffite say to Sergeant Dowdy, "That mace won't stop me from getting you." Sergeant Dowdy testified that Moffite then "slammed me to the floor and jumped on top of me." Moffite wrapped his arm around Sergeant Dowdy's throat. Sergeant Dowdy testified that "he wrapped his leg around me and then . . . [took] his arm and wrap[ped] it around my throat, choked me to the point where it did cut off my blood flow and my breathing." She reiterated, "I couldn't breathe." She struggled to get out of the chokehold. In the end, it took three officers to pull Moffite off of the officer and get him to release his chokehold on Sergeant Dowdy.

¶4. Sergeant Dowdy testified that when she got up, she was "very disoriented . . . everything was a little fuzzy." She had trouble swallowing for several days after. Moffite's actions also resulted in "choking, neck pain, [and] some nightmares up to about two weeks after." At the time of trial, approximately six months after her assault, Sergeant Dowdy testified that she had scar tissue on her neck—a knot under her left jaw.

2

¶5. Another officer, Charlie Eakins, witnessed the assault and testified that Sergeant Dowdy's eyes were bulging out while Moffite choked her. Officer Eakins was able to pull Moffite's arm away from Sergeant Dowdy's neck while two other officers helped restrain Moffite.

¶6. After the attack, officers reviewed footage of numerous phone calls Moffite made while in the holding facility. Moffite made comments indicating his intent to hurt a correctional officer—"I'm going to fight one of these police," and "I'm fixing to beat girls up and everything."

## DISCUSSION

### I. The evidence was sufficient to support an aggravated assault conviction.

¶7. Moffite argues on appeal that his conviction for aggravated assault was unsupported because the evidence was insufficient to show that Sergeant Dowdy suffered serious bodily injury.

¶8. Our standard of review is whether any rational trier of fact could have found, beyond a reasonable doubt, that Moffite was guilty of aggravated assault. *Johnson v. State*, 264 So. 3d 822, 826 (¶18) (Miss. Ct. App. 2018). Under Mississippi Code Annotated section 97-3-7(2)(a) (Rev. 2014), "[a] person is guilty of aggravated assault if he . . . attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life . . . ." The Mississippi Supreme Court has defined "serious bodily injury" as an "injury which *creates a substantial risk of death* or which causes serious, permanent disfigurement, or protracted

3

loss or impairment of the function of any bodily member or organ." *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992) (emphasis added); *see also Johnson v. State*, 252 So. 3d 597, 600 (¶13) (Miss. Ct. App. 2017) (reiterating the definition of "serious bodily injury" in aggravated-assault cases).

¶9.     The statute does not define the means by which serious bodily injury must be inflicted to constitute aggravated assault. *Bright v. State*, 986 So. 2d 1042, 1047 (¶18) (Miss. Ct. App. 2008).[1] Aggravated assault based on the use of hands and fists does not require a finding that the hands and fists constitute the use of a deadly weapon; it is enough if their use constitutes means likely to produce either death or serious bodily injury. *Jackson v. State*, 594 So. 2d 20, 24 (Miss. 1992). Under our precedent, the State does not have to prove the victim suffered "serious" bodily injury so long as it was possible. *Id*. "Mere 'bodily injury' is sufficient so long as it was caused with other means likely to produce death or serious bodily harm." *Id*. (internal quotation mark omitted). Whether hands and arms are considered a "means likely to produce serious bodily harm" is a question for the jury. *Id*. Moffite's intention to commit aggravated assault is also question for the jury. *Chambliss v. State*, 919 So. 2d 30, 35 (¶15) (Miss. 2005). Intent is determined by "the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent." *Id.*

¶10.    There is no doubt that Moffite planned the confrontation. Recorded phone conversations between Moffite and an unknown individual revealed Moffite's stated intent

---

[1] We note that in a domestic-violence situation, "strangulation automatically falls under aggravated domestic violence." *Brown v. State*, 2018-KA-00011-COA, 2019 WL 2428769, at *3 (¶17) (Miss. Ct. App. June 11, 2019); *see* Miss. Code Ann. § 97-3-7(4)(a)(iii) (Rev. 2014).

to "fight one of these police." He admitted that he disobeyed the officers' instructions several times and that once he started the fight, he grabbed Sergeant Dowdy to use her as a shield. Moffite testified that it did not matter which officer was near him at the time—he would have grabbed any officer.

¶11. An officer testified that Moffite broke away from the group of officers, chased Sergeant Dowdy, and grabbed her. He further testified that Moffite had Sergeant Dowdy in a chokehold, her eyes were bulging, and she appeared scared. Moffite did not release Sergeant Dowdy of his own accord, but had to be physically pulled off of her by three other officers. Sergeant Dowdy attested that Moffite "proceeded to . . . take his arm and wrap it around her throat, choke her to the point where it did cut off her blood flow and her breathing."

¶12. In similar cases, defendants were charged and convicted of aggravated assault for choking their victims. *Pritchett v. State*, 171 So. 3d 594, 596 (¶4) (Miss. Ct. App. 2015); *Sellers v. State*, 108 So. 3d 456, 457 (¶1) (Miss. Ct. App. 2012).[2] In *Pritchett*, the defendant grabbed a correctional officer in a chokehold, but she managed to escape. *Pritchett*, 171 So. 3d at 595 (¶¶1-2). Like Moffite, the defendant also made a statement indicating his intent to harm the correctional officer. *Id.* at 597 (¶9). And like Moffite, the defendant asserted he was guilty of simple assault at most. *Id.* at 596 (¶7). But we found sufficient evidence

---

[2] Although Sellers was charged with attempted aggravated assault and Moffite was charged with aggravated assault, "we acknowledge that section 97-3-7(2) fails to distinguish between the two offenses and that, substantively, they are the same crime." *Hunter v. State*, 196 So. 3d 998 n.1 (Miss. Ct. App. 2015); *see also Wilson v. State*, 904 So. 2d 987, 996 (¶32) (Miss. 2004).

5

supported the guilty verdict: surveillance video showed the defendant choking the victim; the victim was clearly in distress; the victim believed the defendant was going to rape her then kill her; and the victim was bleeding from her ears. *Id.* at 597 (¶¶8-9).

¶13. In *Sellers*, the defendant disputed the State's witnesses' testimony, arguing that the victim's injuries were not serious and that the choking was not likely to produce death or seriously bodily injury. *Id*. at 457 (¶4). Yet, one witness testified the victim was "turning blue." *Id*. at 457 (¶3). The victim testified that she was in a chokehold, felt like she would pass out, and the defendant was "choking her to death." *Id*. The defendant did not release the victim until she shot him in the leg. *Id*. We recognized that "[the jury obviously found Sellers intended to injure [the victim] 'by choking her with his hands until she nearly passed out,' as alleged in the indictment." *Id.* at 459 (¶9). This was sufficient evidence to affirm. *Id*.

¶14. Tracking our definition of "serious bodily injury," the jury here was instructed "that 'serious bodily injury' means bodily injury which creates *a substantial risk of death*, OR, which causes serious, permanent disfigurement; OR, protracted loss or impairment of the function of any bodily member or organ of the body." (Emphasis added). Based on the record, a reasonable juror could find that Moffite intentionally caused bodily injury by creating a substantial risk of death to Sergeant Dowdy. He planned to attack an officer, later admitted he did it, and the facility's video showed he did it. It is also reasonable to believe that being placed in a chokehold during a high-tense situation could "create[ ]a substantial risk of death."

6

¶15. The jury was free to consider the evidence, and they determined that Moffite caused serious bodily injury to Sergeant Dowdy by placing her in a chokehold that cut off blood and airflow to her brain. This evidence is sufficient to affirm.

¶16. Moffite also asks that we reverse and remand for a trial on whether he committed the lesser-included offense of simple assault. Because we found that the evidence was sufficient to affirm his aggravated-assault conviction, we decline to address this issue.

## II. Moffite was properly indicted as a habitual offender.

¶17. Moffite challenges his indictment, claiming that the grand jury elected to charge him as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2014), which would allow him to be eligible for parole, and that the State wrongly amended his indictment to include an enhancement to serve life *without* parole eligibility against the grand jury's wishes.

¶18. Rule 14.4(a) of the Mississippi Rules of Criminal Procedure states:

> For good cause shown, indictments may be amended as to form but not as to the substance of the offense charged. Amendment may be allowed only if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised.

¶19. Two months after Moffite's original indictment, the State amended it to remove extraneous language. It removed the phrase "while confined as an offender in the Lauderdale County Detention Facility, Meridian, Mississippi, and in the custody of the Mississippi Department of Corrections." The record lacks any documentation to support Moffite's allegation that he was initially charged under section 99-19-81. Even if there were, the State is expressly allowed under Rule 14.4(a) to amend the form of the indictment.

7

¶20. For these reasons, this assignment of error is without merit.

### III. The jury instructions were properly refused.

¶21. Moffite contends he is entitled to a new trial because the jury instructions did not express his theory of the case. Moffite maintains that his proposed jury instructions presented the theory that he defended himself against the deprivation of senses and human contact by being placed in a suicide cell.

¶22. The circuit court has sole discretion to give or refuse suggested jury instructions. *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012). This Court reviews jury instructions under an abuse-of-discretion standard. *Burgess v. State*, 178 So. 3d 1266, 1272 (¶14) (Miss. 2015). If all the jury instructions, when read together, "state the law of the case and create no injustice, then no reversible error will be found." *Id*. A trial court has the discretion to refuse an instruction that "incorrectly states the law, is covered adequately elsewhere in the instructions, or is without foundation in the evidence." *Victory*, 83 So. 3d at 373 (¶12).

¶23. Because Moffite did not object to the refusal of the two jury instructions, he requests this Court review this issue for plain error. Plain error is an avenue for the defendant to raise an issue on appeal when he failed to contemporaneously object at trial. *Starr v. State*, 997 So. 2d 262, 266 (¶11) (Miss. Ct. App. 2008). But it only applies in certain situations such as where "fairness, integrity, or the public reputation of judicial proceedings" are involved. *Id*. at (¶12). Furthermore, the plain error doctrine corrects apparent transgressions and misapplied law. *Bowdry v. State*, 158 So. 3d 354, 356 (¶6) (Miss. Ct. App. 2014). Where there is a departure from a legal rule, the error is self-evident, and the mistake has prejudiced

the outcome, this Court will find plain error. *Id*. at (¶7).

## A. Instruction D-1 was properly refused.

¶24. Proposed as "D-1," the instruction on "resisting arrest" stated in relevant part:

> The State must also prove beyond a reasonable doubt that the Defendant was not acting in self defense.
> The question of the existence of unwarranted and unreasonable force by the jailers, the necessity or apparent necessity of Defendant to resist the force, as well as the amount of force necessary by the Defendant to employ to resist the actions of the jailers, can only be determined from the standpoint of the Defendant at the time of the incident and under all existing circumstances.
> The Defendant does not have the burden of proving that he acted in self-defense.
> If, after considering all the evidence you have a reasonable doubt as to whether the Defendant acted in self defense, then he can not be convicted so long as you have such a reasonable doubt.

The trial court refused the instruction, explaining that: "[t]he State's position is it is an improper statement of the law. It is not a reasonable defendant standard. It is a reasonable person standard."

¶25. In response to Moffite's contentions, the State argues that D-1 was an incorrect statement of the law and was covered through the other instructions. Moffite asked the jury to examine his actions *subjectively*—"from the standpoint of the defendant. . . ." But according to our longstanding precedent, "whether a defendant has 'reasonable grounds' to fear imminent death or serious bodily injury is governed by an objective criterion." *Hart v. State*, 637 So. 2d 1329, 1339 (Miss. 1994). "The defendant is judged not according to his own particular mental frailties but by a 'reasonable person' standard." *Id*. As a result, D-1 is an improper statement of law and was properly refused.

¶26. Moffite further describes D-1 as a refused "resisting arrest instruction." But this

9

instruction was otherwise given to the jury in another instruction, which provided, "The [c]ourt instructs the jury that a detainee has the right to resist excessive force . . ." Similarly, the burden of proof for the State, addressed in the first paragraph of D-1, was covered by three other instructions.

¶27. As a result, the trial court did not err in refusing D-1.

### B. Instruction D-2 was properly refused.

¶28. Moffite also argues his imperfect self-defense instruction was improperly refused. The proposed instruction "D-2" stated in full:

> If the Defendant committed an assault upon the named Jailer, with an actual, genuine belief that his actions were necessary in order to protect himself from excessive force, even though that belief was not reasonable under the circumstances, then the Defendant did not have the mental requirement to commit aggravated assault.

¶29. Moffite informed the trial court that D-2 was a model jury instruction and therefore proper. In response, the State argued that D-2 applied to the mitigation of murder to manslaughter and was therefore inapplicable in aggravated-assault cases. The trial court refused the instruction, finding that all elements of self defense and the reasonable person standard found in D-2 were covered by another instruction.

¶30. Moffite argues that imperfect self defense can be given in cases of aggravated assault. But he failed to cite any authority in support of this broad assertion. Arguments that fail to cite supporting material are procedurally barred. *Hill v. State*, 215 So. 3d 518, 524 (¶10) (Miss. Ct. App. 2017); *see* M.R.A.P. 28(a)(7) ("The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with

citations to the authorities, statutes, and parts of the record relied on."). Because there is no citation provided in support, and we are already reviewing under plain error, we find no reversible error in the trial court's refusal of D-2.

### IV. The trial court remained impartial.

¶31. Moffite also argues the trial court committed "plain error" by placing itself *into* the trial proceedings. This Court can address glaring errors that affect a defendant's "fundamental, substantive right" even when the defendant failed to raise the issues at the trial level. *Corbin v. State*, 74 So. 3d 333, 337 (¶11) (Miss. 2011). Moffite argues a violation of his "fundamental right" to have an impartial judge and not a "master" thirteenth juror.

¶32. Contending that the trial court actively inserted itself into the State's cross-examination, Moffite argues he was denied a fair trial and due process of law because of the assistance given by the trial court on behalf of the prosecution.

¶33. The words and actions of trial courts have great weight with juries. *Brashier v. State*, 197 Miss. 237, 242, 20 So. 2d 65, 66 (1944). Always under the watchful eye of the jurors, the court must be aware of its conduct, listen to its words, and be mindful of its power to influence. *West v. State*, 519 So. 2d 418, 423 (Miss. 1988). When in the presence of the jury, the trial court can never be too careful and reserved in its actions. *Id*. Furthermore, where the trial court shows bias, urges an outcome, or conveys to the jury in a consequential manner the impression that it has sided with the prosecution, we will reverse. *Layne v. State*, 542 So. 2d 237, 242 (Miss. 1989). But it is within the right of the trial court to question witnesses to develop the truth. *Jones v. State*, 223 Miss. 812, 820, 79 So. 2d 273, 276

11

(1955).

¶34.    In support of his arguments, Moffite cites to a case where the Supreme Court found thirty occasions where the trial court inappropriately inserted itself into a trial. *West*, 519 So. 2d at 421. The trial court guided the district attorney twenty of those thirty times. *Id*. In nine other instances where the district attorney's questions were inadequate, the trial court interjected again to ask questions of the witnesses. *Id*. The Supreme Court held that the questions posed by the trial court bolstered the prosecution's case. *Id*.

¶35.    The trial court here did ask questions and made statements in front of the jury. But the trial court's questions and comments were an attempt to clarify Moffite's answers and move questioning along.

¶36.    Every sequence of questions by the trial court was triggered by an objection of "nonresponsive" by the State. For instance:

| | |
|---|---|
| Moffite: | You are steadily asking the same question over and over. I said I don't recall. |
| The State: | Objection; nonresponsive. |
| The Court: | He—you said you don't recall? |
| Moffite: | Yes, sir. |
| The Court: | So that means, essentially, that you could have said it maybe but you don't remember you said it. |
| Moffite: | Yes, sir. |
| The Court: | Is that a yes or no? |
| Moffite: | No, that I don't remember. |
| The Court: | And his next question was, Well, Mr. Moffite, that means you could have said it and you just don't remember it. |
| Moffite: | Okay. Yeah. |
| The Court: | Okay. |

This pattern continues throughout three other sections of the trial record. The State objected to Moffite's unresponsiveness, and only after the objection did the trial court then question

him.

¶37. Moffite also suggests that the trial court improperly commented on the evidence by giving a "summation and statement of the evidence." In support of his assertion, Moffite relies on *Hannah v. State,* 336 So. 2d 1317, 1319 (Miss. 1976). There the grand jury indicted the defendant for embezzlement. *Id*. Initially, the State purported that the defendant embezzled $8,823.50 but, due to the incorrect amount, later moved to amend the indictment. *Id*. The trial court proceeded to ask defense counsel if there were any objections, which they answered in the affirmative. *Id*. The trial court overruled the objection stating, "We could stay here a month. The defendant can't complain about reducing the amount to $1,176.50." *Id*. Our Supreme Court found that the trial court's comments resulted from the language of the objection. *Id*. They found the trial court's response was not one that would cause the jury to be prejudiced towards the defendant and that it merely explained his ruling. *Id*.

¶38. Similar to *Hannah*, the comments made by the trial court did not result in prejudice. Instead, the statements were nothing more than an explanation to end the State's repetitive questioning. Unlike *Hannah,* however, defense counsel did not object to the trial court's statements or questions. Failure to object to a trial court's allegedly improper comments at trial will waive the issue on appeal. *McDowell v. State*, 984 So. 2d 1003, 1023 (¶82) (Miss. Ct. App. 2007).

¶39. To the extent this issue is not procedurally barred, it is without merit.

**V.     Moffite waived all discovery violations by failing to object.**

¶40. Moffite argues that a discovery violation occurred when the State failed to disclose

Sergeant Dowdy's testimony alleging the existence of permanent scar tissue in her throat. Based on a note from the jury, Moffite maintains that Sergeant Dowdy's testimony contributed substantially to the verdict.

¶41. Mississippi Rule of Criminal Procedure 17.2 requires the State to disclose all witnesses and provide a copy of any preserved statements—whether written or recorded—as well as a summary of any oral statement given by any witness. MRCrP 17.2. When examining the entire record, a violation of Rule 17.2 is deemed harmless error unless the infraction results in a miscarriage of justice. *Smith v. State*, 28 So. 3d 678, 680 (¶2) (Miss. Ct. App. 2010). Our Supreme Court has provided a remedy for defendants who are entitled to discovery but are faced with late disclosures. *Dowbak v. State*, 666 So. 2d 1377, 1385 (Miss. 1996). That antidote is the power to request a continuance. *Id*. But a defendant must undoubtedly ask for a continuance. *Id*. If this request is not forthcoming, the issue is waived. *Id*. Furthermore, where undisclosed evidence is admitted and a criminal defendant fails to make a contemporaneous objection, the issue is procedurally barred on appeal. *Smith*, 28 So. 3d at 680 (¶8).

¶42. Even though Moffite contends he was unaware of Sergeant Dowdy's plan to testify about existing scar tissue, the record shows that Moffite did receive notice that the State intended to question Sergeant Dowdy about her injuries and ongoing problems from the attack. The State also forwarded Sergeant Dowdy's statement—which references "the trauma of the attack and the lasting issues"—to Moffite. If Moffite was truly surprised by previously undisclosed discovery, he should have moved the court for a continuance.

14

Moffite's failure to do so causes this issue to be waived.[3]

###### VI.     Moffite was properly sentenced.

¶43.    Moffite argues that burglary of a dwelling was not considered a crime of violence at the time of his conviction in 2003; therefore, his sentence as a habitual offender under Mississippi Code Annotated section 99-19-83 (Rev. 2015) should be vacated.

¶44.    Prior to 2014, to designate burglary of a dwelling as a violent crime, the State had to prove actual violence during the commission of the burglary. *Brown v. State*, 102 So. 3d 1087, 1092 (¶21) (Miss. 2012). In 2014, the Legislature defined burglary of a dwelling as a "per se crime of violence." Miss. Code Ann. § 97-3-2 (Rev. 2014). This Court has recognized that it is a fundamental right "not to be subject[ed] to ex post facto laws." *Salter v. State*, 184 So. 3d 944, 950 (¶22) (Miss. Ct. App. 2015). But we have found no constitutional violation where an enhanced sentence was enforced based on felonies committed before the passing of a habitual-offender statute. *Miller v. State*, 225 So. 3d 12, 15 (¶12) (Miss. Ct. App. 2017).

¶45.    In *Smith v. State*, 465 So. 2d 999, 1002 (Miss. 1985), prior to the passing of section 99-19-81, the defendant was convicted of three counts of uttering a forgery and grand larceny. The defendant, like Moffite, argued that because his prior convictions occurred before the enactment of the statute, the enhanced sentencing was a violation of the ex post facto laws. *Id*. The court rejected the argument finding that the enhanced sentence was not

---

[3] Moffite was concerned that the jury note substantially contributed to his verdict. The juror questioned whether the serious bodily injury had to occur before or after the attack. The trial court clarified that any injuries arising after the attack were irrelevant, therefore clearing any misunderstanding by the juror and Moffite's concerns.

a brand new punishment for the defendant's prior crimes, but a more severe penalty for the most recent crime. *Id*.

¶46. Just as in *Smith*, Moffite's sentence is not a new penalty for his earlier crimes of residential burglary and grand larceny, but rather a "stiffened penalty" for his recent crime, aggravated assault on a correctional officer. *Miller,* 225 So. 3d at 15 (¶12). This occurred after burglary of a dwelling qualified as a "per se crime of violence." Therefore, his enhanced punishment is not unconstitutional.

¶47. Moffite also contends that the State failed to comply with the Mississippi Rules of Evidence when an operations officer for the Mississippi Department of Corrections (MDOC) testified instead of entering his pen-pack into evidence. He argues that doubt exists about the length of time he served for his prior convictions, so he does not meet the one-year prerequisite for sentencing as a habitual offender to life imprisonment.

¶48. The State must prove the requirements under the habitual-offender statute beyond a reasonable doubt. *Davis v. State*, 680 So. 2d 848, 851 (Miss. 1996). Under section 99-19-83, where one or more of a defendant's prior felony convictions is one of violence, the defendant will receive a life sentence. § 99-19-83. Our Supreme Court held that if "the prosecution proves the prior offenses by competent evidence" and the "defendant [has] a reasonable opportunity to challenge the prosecutor's proof," then the defendant is appropriately charged as a habitual offender. *Taylor v. State*, 122 So. 3d 707, 711 (¶11) (Miss. 2013).

¶49. In *Davis*, the defendant, like Moffite, argued that the State failed to meet the one-year requirement. *Davis*, 680 So. 2d at 851. Both a jail administrator and a parole officer testified

to the defendant's time served. *Id*. The court found that the State presented sufficient evidence that the defendant served one year in custody. *Id*. In *Sumrell v. State*, 163 So. 3d 997, 1000 (¶8) (Miss. Ct. App. 2015), a supervisor for MDOC's records department testified to the amount of time the defendant served. Her testimony was deemed sufficient. *Id*. In *Taylor*, certified copies of the defendant's indictments and sentencing orders were entered into evidence and constituted ample proof of habitual offender status. *Taylor*, 122 So. 3d at 711 (¶11).

¶50.　During the sentencing hearing, the State called the supervisor of MDOC's records department to testify. She testified that Moffite served more than a year in prison for both grand larceny and burglary of a dwelling. The supervisor testified that according to MDOC's records, Moffite served 299 days on his grand larceny charge and another 281.14 after his parole was revoked, totaling 508.14 days; he served 299 days for burglary of a dwelling, in addition to 374.86 days following his parole revocation, for a total of 673.86 days. Moffite also served 365 days in 2008 for a felon-in-possession-of-a-firearm conviction. The State submitted three separate sentencing orders at the sentencing hearing. The orders revealed that Moffite had pleaded guilty to three different felonies: burglary of a dwelling, grand larceny, and felon in possession of a firearm.

¶51.　Moffite argues that his pen-pack should have been placed into evidence. In support, he turns to *Taylor*. However, *Taylor* only held that a pen-pack record qualifies as competent evidence, not that it is the only way to prove the defendant's time served. *Id.* Even if there was confusion regarding the amount of time Moffite served for his burglary of a dwelling

17

and grand larceny convictions, there is no doubt that he served a year for the felon-in-possession-of-a-firearm conviction. Moffite, therefore, meets the section 99-19-83 one-year requirement. The State proved with competent evidence Moffite's prior convictions. Moffite was also provided an opportunity to challenge the prosecution's evidence but neglected to offer any rebuttal evidence.

¶52. Therefore, this assignment of error lacks merit.

¶53. Finding no reversible error in Moffite's conviction or sentence, the judgment of the trial court is affirmed.

¶54. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. J. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**J. WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶55. I concur in part and dissent in part. Pursuant to the direct remand rule,[4] I would reverse and render Moffite's conviction for aggravated assault on a corrections officer as a conviction for simple assault on a corrections officer because there is no evidence in the record that Moffite actually inflicted a "serious bodily injury," as the term is defined under Mississippi law. This result would not affect Moffite's sentence because simple assault on a corrections officer is a felony, Miss. Code Ann. § 97-3-7(1)(b) & (14) (Supp. 2019), and Moffite was convicted as a violent habitual offender. Thus, a conviction for simple assault

---

[4] *See Shields v. State*, 722 So. 2d 584, 585 (¶7) (Miss. 1998).

18

on a law enforcement officer would carry the same mandatory life sentence that Moffite received for aggravated assault. Miss. Code Ann. § 99-19-83 (Rev. 2015).[5]

¶56.    The indictment in this case specifically alleged that Moffite "knowingly and purposely cause[d] serious bodily injury to Jodi Dowdy . . . by striking [and] grabbing her around the neck and applying pressure, cutting off blood and air flow to her brain[.]" Similarly, the jury was instructed that in order to convict Moffite of aggravated assault they had to find beyond a reasonable doubt that he "knowingly or purposely cause[d] serious bodily injury to Jodi Dowdy . . . by grabbing her around the neck and applying pressure, cutting off blood and air flow to her brain[.]" Thus, both the indictment and the jury instructions specifically required the State to prove that Moffite *actually* "cause[d] serious bodily injury to Jody Dowdy."

¶57.    There are other ways that the crime of aggravated assault could have been charged. For example, a person is also guilty of aggravated assault if he "*attempts* to cause serious bodily injury to another" or "attempts to cause or purposely or knowingly causes *bodily injury* to another *with a deadly weapon or other means likely to produce death or serious bodily harm*." Miss. Code Ann. § 97-3-7(2)(a) (emphasis added). If the State had prosecuted Moffite on such a theory, then the State would not have been required to prove that Dowdy *actually* suffered a "serious bodily injury." But the State did not pursue such a theory. Rather, the indictment and jury instructions specifically required the State to prove that Dowdy actually suffered a "serious bodily injury."

¶58.    Because of the substance of the indictment and the jury instructions in this case, the

_____

[5] I concur with the majority opinion that Moffite's other issues are without merit.

precedents cited by the majority are inapposite. In *Pritchett v. State*, 171 So. 3d 594 (Miss. Ct. App. 2015), the defendant was charged with and convicted of *attempting* to cause serious bodily injury. *Id.* at 596 (¶7). There was sufficient evidence to support the conviction because Pritchett choked and violently attacked a correctional officer and even stated that "he tried to kill that b*tch." *Id.* at 597 (¶¶8-9). Clearly, Pritchett's own words and actions were sufficient evidence that he *attempted* to cause serious bodily injury. *Id.* at (¶10). And because of the nature of the charge against Pritchett, the seriousness of the victim's actual injuries was not at issue. Our opinion simply did not address the question whether the victim *actually* suffered any "serious bodily injury."

¶59. In *Sellers v. State*, 108 So. 3d 457, 456 (Miss. Ct. App. 2012), the defendant was convicted of *attempting* to cause "bodily injury" *by using a means likely to produce death or serious bodily harm*. *Id.* at 459 (¶7). This Court specifically made the point that the State was *not* required to prove that Sellers caused "'serious' bodily injury" because of the nature of the charge against him. *Id.* We held that it was "for the jury to decide" whether Sellers's violent choking of his victim was "a means likely to produce serious bodily harm." *Id.* at (¶¶7-9). Just as in *Pritchett*, this Court never discussed whether the victim *actually* suffered any serious bodily injury. The only issue was whether Sellers had *attempted* to cause any bodily injury (serious or not) by a means likely to cause serious bodily harm.

¶60. Thus, *Pritchett* and *Sellers* simply do not address the relevant issue in this case: whether Dowdy *actually* suffered a "serious bodily injury." The majority's statement that other defendants have been "charged and convicted of aggravated assault for choking their

20

victims," *ante* at ¶12, glosses over this crucial difference.

¶61.    There is nothing in the record to show that Dowdy suffered a serious bodily injury, as Mississippi law defines that term. A "serious bodily injury" is defined as a "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Johnson v. State*, 252 So. 3d 597, 600 (¶13) (Miss. Ct. App. 2017) (quoting *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992)). Dowdy testified that Moffite choked her until she "couldn't breathe" and that she "was very disoriented" when she "got up." Photographs show that Dowdy's neck was bright red after the attack. She testified that she experienced pain and soreness in her neck and throat for a couple of days, and she missed one day of work. She also stated that, six months after the attack, she still had a "knot" or "scar tissue" on the left side of her throat, although the nature of that injury is not clear from the record.

¶62.    Moffite's attack was violent, and undoubtedly it was terrifying for Dowdy. The assault certainly *could have* resulted in a serious bodily injury or worse *if Dowdy's fellow officers had not intervened and removed Moffite from Dowdy*.[6] Thankfully, though, Moffite was restrained before he inflicted worse injuries, and the injuries that Dowdy *actually* suffered did not create any "substantial risk of death" or result in any "serious, permanent disfigurement." Therefore, based on the indictment and jury instructions in this case,

---

[6] Thus, the evidence probably would have supported a conviction for aggravated assault for *attempting* to cause serious bodily injury or for causing *bodily injury by means likely to cause serious bodily harm*. *See supra* ¶¶57-59. However, the indictment did not allege such a theory, and the jury was not instructed on such a theory. We cannot affirm a conviction based on a theory that was never presented to the jury.

Moffite's conviction should be reversed and rendered as a conviction for the lesser-included offense of simple assault on a corrections officer. As stated above, because Moffite was convicted as a violent habitual offender, that offense would carry the same mandatory life sentence that Moffite received for aggravated assault.